**Harold TATE, Jr., Ronnie Tate, Individually, and d/b/a Tate Fabricating Company, and Reliance Insurance Company**

v.

**TRIALCO SCRAP, INC., and CDM Holding Corporation, d/b/a Drossmet, and the Hartford Accident and Indemnity Company.**

No. 3–88–0593.

United States District Court, M.D. Tennessee, Nashville Division.

June 15, 1989.

Jon E. Jones, Moore, Jones, Rader & Clift, Cookeville, Tenn., for plaintiffs.

B. Morris Martin, Pat Huddleston, II, McKenzie & McPhail, Atlanta, Ga., James D. Madewell, Madewell & Jared, Cookeville, Tenn., for defendants.

## MEMORANDUM

MORTON, Senior District Judge.

In this action, a lessor and its subrogated insurer seek damages from a tenant who negligently caused a fire which damaged the leased building. This court has jurisdiction based upon diversity of citizenship. The law to be applied is that of the State of Tennessee. Since there is no Tennessee law directly on point, this court's duty is to predict what law the Tennessee Supreme Court would apply under the same circumstances. In making this prediction, the court must rely first of all upon what limited guidance is available in Tennessee case law. To the extent that Tennessee case law alone does not shed enough light on the subject, the court will consider the per-

suasive authority of other jurisdictions as well as the policy rationale underlying the competing positions. As explained below, this court concludes that Tennessee law does not allow recovery against the negligent tenant under the circumstances present in this case. The sparse Tennessee case law relevant to the issue suggests this result. Furthermore, this result would be in accord with the greater weight of authority in other jurisdictions. Finally, the court also believes this result to be the better public policy. Accordingly, judgment is entered in favor of the defendants. As will also be explained below, however, the court rejects the defendants' counterclaim.

## FACTUAL BACKGROUND

Plaintiffs Harold Tate, Jr., and Ronnie Tate, doing business as Tate Fabricating Company, own an industrial building and lot in White House, Tennessee. On April 3, 1984, the Tates leased this building to Trialco Scrap, Inc., and Drossmet. Although named as separate defendants, Trialco Scrap and Drossmet are actually one party. Drossmet is simply the trade name by which Trialco Scrap does business.

The arguably pertinent portions of the Tate–Trialco lease provided as follows:

8. MAINTENANCE & OPERATIONS. Maintenance of the Building, grounds, and storage buildings shall be the responsibility of the Lessee. Any structural damage inflicted by the Lessee shall be repaired by and at the expense of the Lessee. The Lessor agrees to correct or repair defects in the building structure during the first year of this Agreement. Thereafter, repairs shall be the responsibility of the Lessee unless caused by faulty construction or defective design of the Building or the grounds.

. . . .

10. LIABILITY OF LESSEE. The Lessee shall indemnify Lessor and hold Lessor harmless for all loss, damage, expense and/or penalty arising from any claim or allegations of personal injury or damage to property. In the event the Lessor sells or assigns this lease, the terms of this Agreement shall remain applicable and shall be applied and administered as written and signed by current Lessor.

11. DEFAULT. Lessee shall be in default if it fails to make monthly rental payment within ten (10) days of receiving notice of failure to pay from Lessor or if Lessee fails to maintain or insure the Building as herein provided. Upon default, Lessor shall have the right, in addition to any and all other rights it may have, to terminate this lease and take possession of the Building.

. . . .

13. DESTRUCTION OF THE BUILDING. In the event the Building is damaged or destroyed through no fault or negligence of the Lessee and the Lessee's production is reduced by 30% as a result thereof, the Lessee shall be permitted to move and cease rental payments without being in default. In the event Lessee's production is not thereby reduced by 30% or Lessee elects to continue this Lease Agreement despite reduction in production by 30% or more, the rent payable under this lease shall be abated proportionately according to the floor area of the Building which is unusable by the Lessee. Such abatement shall continue for the period commencing with such damage or destruction and ending with the completion by the Lessor of such work or repair and/or construction to make the Building, or the damaged portion thereof, usuable by the Lessee.

14. INSURANCE. Throughout the terms of this lease, the Lessor shall pay premiums for insurance coverage on the Building only. Any damage caused by the Lessee shall be paid for by the Lessee. The Lessee shall provide Certificate of General Liability Insurance up to $500,000.00 with one million dollar umbrella.

In accordance with the lease, the Tates subsequently insured the building with plaintiff Reliance Insurance Company. The policy included fire coverage. Tate Fabricating Co., Inc., was the only named

insured. Like most policies, this one granted Reliance subrogation rights, but it also granted the insured the right to foreclose subrogation rights against any tenant even after a loss had already occurred.

Defendant Drossmet purchased insurance from The Hartford Accident and Indemnity Company. This policy provided general liability coverage as well as protection for Drossmet's personal property and improvements.

On June 12, 1987, the defendants negligently caused a fire which substantially damaged the leased building. After a delay caused by questions concerning which insurance company was responsible, Reliance paid $141,500 to have the building repaired. The Tates also paid $1,000 since this was the amount of their deductible under the policy. Now, the Tates and Reliance seek to recoup their losses from Drossmet and Trialco. The defendants deny liability on the ground that the parties intended for the Reliance insurance policy to be procured for the mutual benefit of the lessor and lessee. The defendants also counterclaim for lost profits and property damages allegedly caused by the delay in beginning repair. Additionally, the defendant seeks approximately $17,000 as reimbursement for costs allegedly incurred for repair of the basic lighting in the building.

## TENNESSEE LAW

### A. Basic Propositions

The key question is whether the provision requiring the lessor to purchase insurance coverage for the building when viewed as part of the whole lease, relieves the lessee from liability for the fire it negligently started. The lessee's theory is that this provision expressed an intent that the lessor would look only to the insurance for recovery from a fire even if negligently caused by the tenant. In other words, the tenant contends that it is a coinsured or that the parties contracted for the insurance to be for their mutual benefit. The lessor and the insurer, on the other hand, argue that the insurance was only for the lessor's benefit and that the lease as a whole expresses an intent that the lessee be liable for any damage inflicted by the lessee regardless of whether the lessor's insurance covered the damage. Unfortunately, Tennessee case law does not directly address the issue.

The plaintiffs contend that "[t]he controlling law in this case is set forth in *Anderson v. Miller*, 96 Tenn. 35, 33 S.W. 615 (1896)." In *Anderson*, a landlord's fire insurance company was allowed to recover from a tenant responsible for a fire loss. Thus, *Anderson* demonstrates that a tenant may be held responsible for his negligent destruction of leased premises. Certainly the court has no quarrel with this as a general rule of law, but it does not address the critical inquiry in this case. *Anderson* involved no contract which could even arguably be construed to have shifted this responsibility. In the case at bar, however, the parties entered into a contract which at least arguably expresses an intent that the tenant be excused from the traditional liability for negligent burning of the building. *Anderson* says nothing about such contracts.

Likewise, *Miller v. Russell*, 674 S.W.2d 290 (Tenn.App.1983), cited by the defendants, is of little help. The *Miller* court denied an insurer's attempt to subrogate against an allegedly negligent defendant who was also a named loss payee on the insurance policy. The court held that a named loss payee is an "insured" under the policy and that "no right of subrogation exists where the wrongdoer is also an insured under the same policy." *Id.* at 291. Again, the court certainly finds no fault with the general proposition that an insurance company may not seek subrogation against an insured. Indeed, the plaintiffs apparently even concede this point. That principle in itself, however, says nothing about whether under the facts of this case, the defendants may be considered an implied coinsured under Reliance's policy. If the defendants are implied coinsureds, then, of course, judgment must be entered in their favor. Likewise, if the plaintiffs otherwise contracted to relieve the defendants of liability for their negligent damage to the leased structure, then judgment

must be in favor of the defendants. Miller, however, involved a completely different contractual arrangement than that present in this case. Most importantly, the *Miller* defendant was a *named* loss payee. Accordingly, *Miller* does not help answer the questions of whether the present defendants are coinsureds or whether the lease relieves the defendants of responsibility for negligent destruction of the leased premises.

The lease at issue in this case contains two critical components. First, the lease on more than one occasion speaks of the lessee being responsible for damage inflicted by the lessee. For future reference, this will be deemed generally as the repair obligation. Second, the lease requires the lessor to purchase insurance coverage on the building. Obviously, the first provision seems to hold the tenant accountable under the present situation, and the second seems to relieve the tenant of this burden. As just stated, neither *Anderson* nor *Miller* offer any guidance for resolving this kind of problem. Fortunately, a couple of other Tennessee cases at least provide a little help.

Throughout any analysis of these other cases, however, the court bears in mind that its foremost duty is to construe the contract so as to best effectuate the parties' intent. Certainly the parties are free to contractually shift responsibilities if they so desire. In determining if they did so intend, the court first looks to the language of the written contract. If unambiguous, that language must be given effect. Furthermore, words must be given their plain and ordinary meaning, and, where possible, various provisions are construed as all having meaning and all being in harmony with one another. Finally, the court must also apply any other appropriate rules of law or rules of construction. If the examination of the contract alone still does not divulge an intent, then the court must turn to extrinsic evidence. *See generally First American National Bank v. Chicken System of America, Inc.,* 510 S.W.2d 906 (Tenn.1974); *Chazen v. Trailmobile,* 384 S.W.2d 1 (Tenn.1964); *St. Paul Surplus Lines v. Bishops Gate Insurance Co.,* 725 S.W.2d 948 (Tenn.App.1986); *National Garage Co. v. George H. McFadden & Bro., Inc.,* 542 S.W.2d 371 (Tenn.App. 1975); *In re Memphis–Friday's Associates,* 88 B.R. 830 (Bkrtcy, W.D. Tenn.1988).

### B. Importance of Agreement to Purchase Insurance

*Evco Corporation v. Ross,* 528 S.W.2d 20 (Tenn.1975) is possibly the Tennessee case most relevant to the one at bar. In *Evco,* the Tennessee Supreme Court held that a lease rendered the lessor responsible for restoration of a structure damaged by fire. Specifically, the *Evco* lease provided as follows:

> It is understood and agreed that the lessee shall be responsible for the minor repairs that may become necessary to the building structure during the term of the lease, and if said lessee desires to make any addition to the said building structure or to otherwise alter, modify or change same, consent of the lessee [sic] shall first be obtained.

> Lessee shall carry liability insurance upon the premises sufficient to save the lessor harmless for any liability that might arise in the use of the said premises.

> The lessor shall be responsible for all major repairs that may become necessary to the building structure during the term of the lease and should same occur lessor shall make necessary repairs within a reasonable period of time following the occurance [sic].

> The lessor shall carry fire insurance upon the building structure for any damage thereto by fire.

> It is understood and agreed that the lessee shall return the premises back to the lessor at the expiration of the lease, in as good condition as when premises first occupied, wear and tear excepted from ordinary use.

Based upon these provisions, the *Evco* court concluded that the lease "impose[d] a general obligation upon the lessors to assume responsibility for fire loss during the term of the lease." *Id.* at 24. In explanation, the court noted that the lessor had

"expressly covenanted with the tenant that [the lessor] would carry fire insurance for any damage to the building during the term of the lease, and simultaneously agreed to make all major repairs." *Id.*

From this explanation, it is clear that the Tennessee Supreme Court considers provisions requiring landlords to carry insurance to be an important factor in determining who is liable for damage to a leased building. Nevertheless, a close comparison of the Tate–Trialco lease with the *Evco* lease reveals some important differences. These differences are too substantial to allow *Evco* alone to dictate the result in the present case. In *Evco*, both the repair component of the lease and the insurance component of the lease support holding the lessor responsible for fire damage to the building. The Tate–Trialco lease, on the other hand, has nothing comparable to the *Evco* requirement that the lessor be responsible for all major repairs. Indeed, to the contrary, the repair component of the Tate–Trialco lease points toward holding the lessee responsible.

First, paragraph 8 speaks of the lessee maintaining the building and repairing any structural damage inflicted by the lessee. It also provides for the lessor to repair defects occurring during the first year, and for such repairs thereafter to be the lessee's responsibility unless caused by faulty construction or design of the building. Paragraph 14 explicitly states that "[a]ny damage caused by the Lessee shall be paid for by the Lessee." Interestingly, the lease does not contain the standard provision found in most leases, including the *Evco* lease, concerning the lessee having an obligation to surrender the premises in good repair, ordinary wear and tear excluded. Nevertheless, the provisions just discussed create a very similar legal effect. Of course, without the standard "surrender in good repair" provision, this lease is also lacking the often attached "except fire" clause which some courts have used to excuse tenants from negligence liability.

At least with regard to the lease provisions concerning repair, therefore, one may easily observe substantial differences between the *Evco* lease and the Trialco lease. In *Evco*, the repair component of the lease, predominantly the provision obligating the lessor to perform major repair, pointed toward excusing the tenant from liability. In the present case, however, the Trialco lease repair components seem to indicate an intent that the tenant be held accountable. Thus, to the extent that the *Evco* holding relies upon the repair component of the lease, it damages the cause of the present defendants.

On the other hand, *Evco* relied heavily upon the provision obligating the lessor to carry fire insurance on the building. To the extent it did so rely, it provides substantial support for the position of Trialco and Drossmet. Both the Trialco and *Evco* leases contained provisions requiring the lessee to carry liability insurance. Then, both also contained a provision requiring the lessor to insure the building while saying nothing of any similar obligation on the part of the lessee. In *Evco*, the lessor's obligation was only to carry fire insurance, while in Trialco the obligation was to provide insurance coverage for the building in general. Yet, the court concludes this distinction is irrelevant because an obligation to insure the building in general certainly encompasses an obligation to insure the building against fire loss. The question is whether this insurance component of the lease and its accompanying intimations of exculpating the lessee from liability are sufficient to outweigh contrary suggestions by the repair component of the lease.

To the extent that *Evco* relies upon the insurance component of its lease, *Evco* provides strong support for the defendants' position. However, since *Evco* also relied upon the repair provision, *Evco* can ultimately be used in the present case for nothing more than the proposition that the Tennessee Supreme Court does consider an obligation to purchase insurance to be important to the determination of whether the parties intended the nonpurchasing party to be relieved of liability. *Evco* does not, however, indicate whether an insurance provision standing alone is sufficient to shift responsibility for negligent fires from the tenant to the landlord and its insurer.

An additional distinction between *Evco* and the present case should also be pointed out. In *Evco*, the Supreme Court noted that "the origin of the fire [was] not ... disclosed in the record." Thus, we do not have the benefit of knowing for sure whether the court would have construed the lease differently under facts presenting a fire negligently caused by the tenant. It is possible that the Supreme Court did not deem the cause of the fire relevant. However, it is also possible that the court would have considered negligence very relevant but did not address the question because it was not raised by the parties. Furthermore, it is also possible that the Court would sometimes consider negligence to be important, but not when the lease discussed insurance coverage for *any* damage by fire. The use of the word "any" in the *Evco* lease could have possibly eliminated all problems raised by the issue of negligence on the basis that "any" clearly meant negligent fires as well as non-negligent fires. If something less would also have been sufficient is left unanswered.

■ Since the Trialco lease does not speak of insurance coverage for *any* damage to the building, the *Evco* holding's reliance upon the insurance clauses may arguably be inapplicable to Trialco's situation on the ground that the *Evco* clauses more specifically expressed an intent to include coverage for negligent acts. The court does not accept this distinction, however. The language in the Trialco lease is quite broad even if it does not include a word such as "any." The more important arguable distinction is that alluded to earlier concerning the possibility that the *Evco* court did not intend its holding to encompass fires caused by the tenant's negligence. This is simply one more unknown which serves to weaken *Evco's* relevance to the case at hand. In the end, however, at least *Evco* demonstrates that contractual obligations to purchase insurance may be a significant factor in shifting ordinary responsibility for negligence.

*St. Paul Surplus Lines v. Bishops Gate Insurance Co.*, 725 S.W.2d 948 (Tenn.App. 1986), also evidences the importance Tennessee courts place on provisions requiring a certain party to purchase insurance. In *St. Paul*, the insurance and repair components of the lease were on the opposite side of the spectrum from *Evco*. Not surprisingly, therefore, the *St. Paul* court held the lessee responsible to the lessor for the benefit of insurance proceeds received by the lessee.

The relevant *St. Paul* lease provisions stated as follows:

## VI.

### *Repairs*

Lessee shall at all times during the lease and at its own cost and expense, repair, replace, and maintain in good, safe, and substantial condition, all buildings and any improvements, additions, and alterations thereto, on the demised premises, and shall use all reasonable precaution to prevent waste, damage, or injury to the demised premises.

. . . .

## VII.

### *Insurance*

During the term of the lease and for any further time that lessee shall hold the demised premises, lessee shall obtain and maintain at its expense the following types of insurance:

1. *Fire Insurance.* Lessee shall keep all buildings, improvements, and equipment on the demised premises, including all alterations, additions, and improvements, insured against loss or damage by fire.

Pursuant to this contract, the lessee purchased insurance. The building subsequently burned and both the lessee and the lessor sought the entire insurance proceeds. Relying heavily upon the "somewhat analogous situation in reverse" represented by *Evco*, the *St. Paul* court held that "the insurance proceeds should have been used for the rebuilding of the premises, but since they were not so used, the ... lessors are entitled to the proceeds." *Id.* at 952. Quoting from *Evco*, the court noted

that the parties expressly covenanted for one of the parties to carry insurance and to make repairs. Based upon this, the court then in essence declared that the insurance was impliedly for the benefit of the other party who presumably bargained for the inclusion of the insurance provision.

As with *Evco*, however, it must be recognized that the construction of the insurance provision was in conjunction with repair provisions which placed the burden upon the same party which carried the insurance burden. Like *Evco*, *St. Paul* does not address a lease wherein the repair provisions place the burden on one party, while insurance obligations are placed on the other party. Even though they do not address this intermediate situation, however, the two cases do show that Tennessee courts recognize the exculpatory responsibility-shifting nature of lease provisions which require a certain party to purchase insurance. They also show that Tennessee courts place great importance upon these provisions as part of an entire lease which is being construed. Whether these type of provisions have pre-eminence over repair provisions suggesting a different apportionment of responsibility requires resorting to law other than *Evco* and *St. Paul*.

## C. *Principles of Construction*

At this point, some guidance may be received from three principles of contract construction which have support in Tennessee law. If valid, the principle arguably helpful to the plaintiff's case is that exculpatory clauses are disfavored and therefore strictly construed against the party seeking release of liability for his own negligence. This idea receives some support in *Chazen v. Trailmobile, Inc.*, 215 Tenn. 87, 384 S.W.2d 1 (1964).

In *Chazen*, a lessee allegedly negligently caused a fire which damaged the leased building. The lessor sued the lessee for breach of the following lease covenant providing for surrender of the premises in as good condition as received:

> The Lessee covenants to take said property, with the repairs agreed upon by a separate letter hereto attached, and to keep said property in good condition,

and at its own cost and expense make all alterations, improvements and all necessary repairs to the premises herein leased, ... and at the end of said term the Lessee is to return said premises in as good condition as when received, ordinary wear, tear and damage by fire or unavoidable casualty excepted.

Earlier, the plaintiff had brought a common law negligence action based on the same set of facts. After success in the trial court, a court of appeals reversed the judgment on the ground that the lessee had contracted out of liability for negligence. The exculpation clause stated as follows:

> The Lessors waive all right of recovery against the Lessee for any loss occurring to the demised premises resulting from fire ... (enumerating others) ... and the Lessee likewise waives all right of recovery against the Lessor for any similar loss or losses....

The court of appeals rejected the plaintiff's plea to apply a "rule of strict construction against the party relying upon exculpatory clauses in contracts." Rather, the court explicitly held that "the rule of reasonable construction" should be applied, this rule serving to promote the ultimate overriding goal of arriving at the true intention of the parties as expressed in the contract. Applying this rule, then, the court of appeals concluded that the contract expressed an intent that the lessee be relieved of liability for negligence. Certiorari was subsequently denied by the Supreme Court.

The plaintiff's second attempt to gain a judgment against the lessee did progress all the way to the Tennessee Supreme Court. As already mentioned, this claim was based upon breach of contract rather than common law negligence. As did the court of appeals in the negligence action, the Supreme Court relied upon the waiver clause to extinguish the plaintiff's contract action. In the process, however, it cast some doubt on the validity of the court of appeal's rejection of the rule of strict construction for exculpation clauses.

First, the Supreme Court endorsed the idea that a repair and surrender clause obligating the lessee "to return [the] prem-

ises in as good condition as when received, ... *damage by fire* ... excepted" does not by itself exculpate a lessee from liability for negligently caused fires. As will be discussed later, some jurisdictions relieve a lessee from liability based upon this "except fire" clause alone, holding that "fire" includes negligently caused fires. Other jurisdictions have used this clause in conjunction with other clauses to relieve the tenant of liability. In *Chazen*, the Tennessee Supreme Court joined this latter group. The *Chazen* Court indicated that this provision, standing alone, did not relieve the tenant from the responsibility of returning the premises in good condition when the tenant negligently caused the fire. In explanation, the Court stated that "there is liability on the lessee for a negligent fire notwithstanding an excepting covenant in the lease unless there is a clear intention on the part of the parties to include negligent fires within the coverage of the instrument." *Id.* 384 S.W.2d at 3, 4. The Court went on to find, however, that such a clear intention was expressed in *Chazen* since the lease also "state[d] that *all* right of recovery is waived for *any loss resulting from fire.*" *Id.* 384 S.W.2d at 4. In particular, the Court focused on the words "all" and "any," concluding that this must include negligently started fires.

The significance of *Chazen* to the present case is still unclear. The requirement of a clear intent beyond an "except fire" clause casts some doubt on the other *Chazen* Court's rejection of strict construction for exculpation clauses. Yet, the court of appeals' rejection of strict construction was indirectly supported by earlier and later Tennessee Supreme Court decisions. *See Moss v. Fortune*, 207 Tenn. 426, 340 S.W.2d 902 (1960); *Empress Health and Beauty Spa, Inc., v. Turner*, 503 S.W.2d 188 (Tenn.1973). Other appeals court decisions also support a rejection of strict construction. *See Tennessee Liquified Gas Corporation v. Ross*, 60 Tenn.App. 648, 450 S.W.2d 587 (1968), *cert. denied; Parton v. Mark Pirtle Oldsmobile–Cadillac–Isuzu, Inc.*, 730 S.W.2d 634 (Tenn.App. 1987); *Robinson v. Tate*, 34 Tenn.App. 215, 236 S.W.2d 445 (1950). Furthermore, the

*Chazen* Supreme Court never explicitly endorsed the rule of strict construction nor expressly rejected the court of appeals' rule of reasonable instruction. It could be that the Supreme Court deems an "except fire" clause standing alone to be most reasonably construed as including only nonnegligent fires.

At the very least, it is clear that if the Tennessee Supreme Court does follow the rule of strict construction for exculpation clauses, that rule is not as strict as the traditional rule of strict construction described in the court of appeals *Chazen* case as "hold[ing] that unless the word 'negligence' is used in the exculpatory clause it cannot be enforced to avoid liability for negligence." The *Chazen* court of appeals further pointed out that jurisdiction applying this type of strict construction did so on the grounds that exculpation from negligence liability is against public policy. Yet, whereas such provisions may have at one time been against public policy in Tennessee, Tennessee case law today clearly emphasizes a freedom of contract which includes freedom to bargain for negligence indemnification. E.g., *Empress Health and Beauty Spa, supra*. Indeed, this very fact weighs in favor of simply applying a rule of reasonable construction to exculpatory provisions rather than a rule of strict construction. Thus, it appears appropriate to conclude that the *Chazen* Supreme Court's exclusion of negligent fires from "except fire" clauses, absent a clear intent to the contrary, should not be taken as a general presumption against exculpatory clauses.

Of course, even if the *Chazen* Supreme Court does stand for the proposition that some "clear intention" beyond just a preponderance of the evidence of intent is required before the court will enforce an exculpatory clause, *Chazen* still says nothing about whether such a clear intention is present in the case at bar. Obviously, Trialco and Drossmet do not even have the benefit of an "except fire" clause. Yet, just as obviously, *Chazen* did not involve any provision concerning insurance purchase obligations. Thus, *Chazen* says

nothing about whether a contractual provision obligating one person to purchase insurance for a potential event serves as a clear expression of intent that the other party not be held liable for negligently causing that event.[1]

■ *Chazen* does, however, point to a second principle of contract construction which aids the defendants' case. It has long been established that contracts are to be construed against the drafter when there is some question about the proper construction. This, of course, applies to leases just as with other contracts since the *Chazen* court relied in part upon this rule. *Chazen*, 384 S.W.2d at 4. In the present case, the lease agreement was drafted by the plaintiffs. Therefore, in determining the intent expressed by the contract, ambiguities must be construed in favor of the defendants. Thus, if there is a question about whether the provision obligating the lessor to purchase insurance on the building was intended to relieve the lessee of liability for negligently burning the building, that doubt should be resolved in favor of the defendants.

■ A third principle of contract construction also helps the defendants in this case. Where possible, effect should be given to every part of a contract. *See Memphis v. Ford Motor Co.*, 304 F.2d 845 (6th Cir.1962). If the provision in the Trialco lease is construed to give no coverage to the defendants, that portion of the lease becomes virtually irrelevant. There is no reason for the lessor to promise to carry insurance for his own benefit. Thus, since the clause was placed in the contract, the inference must be drawn that it was also for the lessee's benefit.

■ Of course, all of these rules of construction are subordinate to the cardinal rule that a contract should be construed to effectuate the intent of the parties. Indeed, the last-mentioned rule of construction is nothing more than a rule designed to help determine intent, and to some extent, the second rule is also. Unfortunately, even with these rules of construction, Tennessee case law is still rather sparce concerning whether a contract such as the one in this case expresses the intent, as a matter of law, that the lessee be relieved of liability for his own negligence. Accordingly, the court now turns to a consideration of what the greater weight of authority in other jurisdictions would hold under similar circumstances.

## LAW OF OTHER JURISDICTIONS

### A. *Recent Decision*

The modern trend throughout the nation is to prohibit lessor's insurers from recovering against negligent lessees unless the rental contract clearly expresses a contrary intent. In fact, this court is aware of only two decisions in this decade in which a court held a tenant liable in a subrogation action brought by the landlord's insurer. *United States Fidelity & Insurance Co. v. Let's Frame It, Inc.*, 759 P.2d 819 (Colo. App.1988); *Federal Insurance Co. v. Paulk*, 173 Ga.App. 266, 325 S.E.2d 886 (1985). Perhaps there are more, but the clear majority of recent decisions have denied such recovery. At least eight jurisdictions, including Georgia from whence came *Paulk, supra*, have produced one or more cases each in the last decade which excused the tenant from liability.

Granted, some of these cases presented facts more suggestive of exculpation than the situation before this court, but some

1. Another problem with applying a rule of strict construction against exculpatory provisions to this case is that the provision may be technically viewed as something other than an exculpatory agreement. Rather than eliminating any tenant liability, the agreement to purchase insurance may be seen simply as a recognition of liability and a corresponding contractual arrangement whereby the lessor promises "to insure [the tenant] against loss from such liability." *Fred A. Chapin Lumber Co. v. Lumber Bargains, Inc.*, 189 Cal.App.2d 613, 11 Cal.Rptr. 634 (1961). *See also Woodruff v. Wilson Oil Co., Inc.*, 178 Ind.App. 428, 382 N.E.2d 1009 (1978) (exculpatory-oriented arguments irrelevant to construction of agreement to purchase insurance). Nevertheless, many courts have continued to discuss the issue in exculpatory terms, and for the sake of simplicity, this court will also make reference throughout this opinion to the exculpatory effect of an agreement to purchase insurance.

also had facts less favorable to the lessee. Furthermore, the two cases which did hold the tenant liable involved facts more conducive to liability than are present in the case at bar. In particular, *Paulk* is so distinguishable that it has virtually no persuasive authority for holding the present defendants liable. When read in conjunction with *Pettus v. APC, Inc.,* 162 Ga.App. 804, 293 S.E.2d 65 (1982), it even appears that Georgia law actually supports the defendants' argument. *Let's Frame It, supra,* is the only recent case which actually carries any significant persuasive authority for holding the present defendants liable.

Of the eight jurisdictions just mentioned as recently exempting negligent lessees from subrogation actions, five had unequivocally adopted the rule that if a contract requires a party to purchase insurance, that insurance is deemed to be for the mutual benefit of both parties unless a contrary intent is clearly expressed. *See Rizzuto v. Morris,* 22 Wash.App. 951, 592 P.2d 688 (1979); *Cascade Trailer Court v. Beeson,* 50 Wash.App. 678, 749 P.2d 761 (1988); *Safeco Insurance Co. v. Capri,* 101 Nev. 429, 705 P.2d 659 (1985); *New Hampshire Insurance Group v. Labombard,* 155 Mich.App. 369, 399 N.W.2d 527 (1986); *McGinnis v. LaShelle,* 166 Ill.App.3d 131, 116 Ill.Dec. 631, 519 N.E.2d 699 (1988); *Anderson for American Family Insurance Co. v. Peters,* 142 Ill.App.3d 182, 96 Ill.Dec. 489, 491 N.E.2d 768 (1986); *Alaska Insurance Co. v. RCA Alaska Communications, Inc.,* 623 P.2d 1216 (Alaska 1981); *Cf. West American Insurance Co. v. Pic Way Shoes, Inc.,* 110 Mich.App. 684, 313 N.W.2d 187 (1981); *Reich v. Tharp,* 167 Ill.App.3d 496, 118 Ill.Dec. 248, 521 N.E.2d 530 (1987); *Hardware Mutual Casualty Co. v. Bob White Oldsmobile–Cadillac, Inc.,* 46 Ill.App.3d 722, 5 Ill.Dec. 186, 361 N.E.2d 325 (1977); *Cerny–Pickas & Co. v. C.R. Jahn Co.,* 7 Ill.2d 393, 131 N.E.2d 100 (1956). Some even go further and presume any insurance is for the mutual benefit of the parties even if there was no express promise within the contract to purchase the insurance. Thus, if the present case were to be decided under the law of any of these five jurisdictions, the court would have to decide in favor of the defendants. As will be discussed later, there is certainly no clear expression within the lease that the insurance was not to cover acts of negligence by the defendants.

Furthermore, the status of the law in the other three jurisdictions also strongly supports exculpation in the present case. North Dakota, California, and Georgia all appear to attach great exculpatory effect to lease provisions which require a certain party to provide insurance. *See Parsons Manufacturing Corporation, Inc. v. Superior Court, General Accident Fire & Life Assurance Corporation, Ltd.,* 203 Cal.Rptr. 419, 156 Cal.App.3d 1151 (1984); *Agra–By–Products, Inc. v. Agway, Inc.,* 347 N.W.2d 142 (N.D.1984); *Pettus v. APC, Inc.,* 162 Ga.App. 804, 293 S.E.2d 65 (1982). In *Parsons,* the surrender clause excepted damage by fire, and the lease also contained "provisions suggesting that the lessor will provide fire insurance for the building." *Parsons,* 203 Cal.Rptr. at 419. It apparently did not expressly require the lessor to procure insurance. Nevertheless, during the course of the opinion, the court appeared to endorse the idea that an express requirement to acquire insurance would protect both parties from covered occurrences. *Cf. Fred A. Chapin Lumber Co. v. Lumber Bargains, Inc.,* 189 Cal. App.2d 613, 11 Cal.Rptr. 634 (1961).

The *Parsons* court also stated as follows:

[W]here the agreement adverts to the possibility of fire and there is no clear language or other admissible evidence showing an agreement to the contrary, a lease agreement should be read to place on the lessor the burden of insuring the premises (as distinguished from the lessee's personal property) against lessor *and lessee* negligence. Moreover, where the lease has been drawn by the lessor, its language will be construed strictly against the lessor and its insurer.

*Parsons,* 203 Cal.Rptr. at 424. Thus, while never having to address whether it should adopt the requirement of a "clear contrary intent" before holding a lessee liable when the lessor promised to purchase insurance, the *Parsons* court certainly evidenced an

intent to place a heavy burden on the lessor. Accordingly, this court is convinced that California law would exempt the present defendants from liability in this case. When *Parsons* is read in conjunction with *Chapin, supra,* there can be no doubt. *See also Gordon v. J.C. Penney Co.,* 86 Cal.Rptr. 604, 7 Cal.App.3d 280 (1970); *Liberty Mutual Fire Insurance Co. v. Auto Spring Supply Co.,* 131 Cal.Rptr. 211, 59 Cal.App.3d 860 (1976).

Likewise, *Agra–By–Products, supra,* supports the defendants' position even though the North Dakota Supreme Court never explicitly adopted the rule that an express provision is required before a tenant can be liable to the lessor's insurer for a negligently caused fire. The *court* noted that such a rule was the modern trend, but it also noted that "[a] majority of the cases [applying this rule] construe lease agreements which also include, and upon which is placed considerable emphasis, a provision obligating the lessee to surrender the leased premises at the end of the lease in the same condition as when acquired with exception for fire." *Id.* at 147. There was no such exception clause in *Agra–By–Products.* Of course, there was also no such clause in the Tate–Trialco lease. In the end, the North Dakota Court never expressly adopted the above rule, nor discussed the significance of an "except fire" clause to the rule's application. Instead, the Court simply concluded that the lease provision requiring the purchase of insurance was "a clear indication of the parties' intent to provide for the mutual protection of their insurable interests in the leased property." *Id.* at 150.

Specifically, the relevant lease provision provided as follows:

> 5. That the parties hereto agree that the insurance provisions in full force and effect as shown by the policy of insurance attached hereto and made a part hereof by reference as Exhibit 1 shall continue unless otherwise agreed upon by the parties in writing, so long as this lease is in effect. That the LESSEE herein agrees to reimburse LESSOR for all insurance premiums of any nature of kind paid by the LESSOR for said insur-

ance on the buildings which are the subject of this lease.

> . . . .

> 7. Further, the party of the second part, LESSEE, does hereby further agree to maintain the leased buildings and equipment, together with the service and access roads in as good condition as they now are, excepting normal wear and tear by the elements alone. Further, the party of the second part, LESSEE, agrees that all normal, usual and ordinary maintenance and repair of the premises ... shall be the responsibility of the LESSEE.

> . . . .

> 10. ... [LESSEE] will, at the expiration of the time as herein recited, quietly yield and surrender the aforesaid premises to the said party of the first party, LESSOR, his heirs and assigns, in as good condition and repair as when it took them excepting normal wear and tear as set out in Paragraph 7 above that the party of the second part, LESSEE, shall make any and all necessary repairs and maintenance on the premises during the term of this lease. . . .

Admittedly, the intent expressed in this *Agra* lease is more clear than that expressed in the lease at hand. Importantly, the *Agra–By–Products* lease directly placed the insurance premium burden upon the lessee despite the fact that the lessor would actually purchase the insurance. This explicit recognition that the lessee is ultimately paying for the insurance creates a more natural expectation that the lessee should therefore receive the benefit of the insurance. Nevertheless, as will be discussed again in the policy portion of this opinion, the lessee ultimately paid for the insurance in the present case even though this payment was not expressly recognized in the lease. Based upon this fact and the general discussion in *Agra–By–Products,* this court concludes that North Dakota law would also provide exculpation to the defendants in this case.

Despite being the source of one of the few reported decisions in this decade in

which a lessor's insurer was allowed to recover against a negligent tenant, Georgia also appears to support the present defendants' case. *Federal Insurance Co. v. Paulk*, 173 Ga.App. 266, 325 S.E.2d 886 (1985), the case allowing such recovery, contains a critical factual distinction from the case at hand. In *Paulk*, there was apparently absolutely nothing in the lease, if there was a written lease, which in any way alluded to insurance or exceptions to liability. For present purposes of analysis, *Paulk* was exactly like the Tennessee *Anderson* case discussed earlier. It says nothing about the exculpatory impact of lease provisions which obligate a certain party to purchase insurance.

On the other hand, a 1982 Georgia case did involve a lease provision concerning insurance, and that case exonerated the allegedly negligent lessee. *Pettus v. APC, Inc.*, 162 Ga.App. 804, 293 S.E.2d 65 (1982). As with *Agra–By–Products, supra*, however, the insurance provision within the lease was apparently more expressive than the provision currently before the court. Thus, it is not absolutely clear that the same Georgia court would exonerate the present defendants. Furthermore, there was only limited discussion from which other guidance may be drawn. Nevertheless, the rule followed by the court was

> that where parties to a business transaction mutually agree that insurance will be provided as a part of the bargain, such agreement must be construed as providing mutual exculpation to the bargaining parties who must be deemed to have agreed to look solely to the insurance in the event of loss and not to liability on the part of the opposing party.

*Id.* 293 S.E.2d at 66.

Presumably, this language would include exculpation for the present defendants. Certainly the Tates' promise to purchase the insurance was a part of the overall bargain. Yet, since the Pettus lessee actually agreed to pay for the insurance premiums as a part of his rent, it provides a more explicit "mutual bargain and intent of mutual protection" than present in the Tri-

alco lease. Accordingly, there is a chance Georgia law would not provide protection to Trialco and Drossmet. Nevertheless, it appears that such protection would probably be afforded, and therefore Georgia is simply one more of the many jurisdictions which have recently applied law which would extinguish the subrogation action before this court. *See also Tuxedo Plumbing Co., Inc. v. Lie–Nielsen*, 245 Ga. 27, 262 S.E.2d 794 (1980) (although involving an owner and contractor, is source of above-quoted rule and provides other strong language supporting the present defendants).

Additionally, another case decided this decade strongly suggests that Nebraska is part of the majority group which would not permit a subrogation action such as the one before the court. *Reeder v. Reeder*, 217 Neb. 120, 348 N.W.2d 832 (1984) actually involved a guest/host relationship rather than a lessor/lessee relationship. However, in the process of denying a subrogation claim against the negligent guest, the Nebraska Supreme Court approvingly noted the modern trend of denying tenant liability for negligence "absent an express provision establishing the tenant's liability." *Id.* 348 N.W.2d at 836.

Thus, out of the ten jurisdictions to provide some guidance on this issue during the 1980's, only one would probably allow the present plaintiffs to recover on their claim. And even this jurisdiction is not without doubt. In allowing subrogation in *United States Fidelity & Guaranty Company v. Let's Frame It*, 759 P.2d 819, 823 (Col.App. 1988), the Colorado court of appeals relied in part upon the fact that the lease "contain[ed] no *requirement* that the landlord must obtain insurance of any type." (Emphasis in original.) This language may open the door to exculpation when there is a specific requirement to purchase insurance.

Nevertheless, the *Let's Frame It* opinion as a whole seems to indicate that the Colorado courts would not look too kindly upon the present defendants' defense. Even though the *Let's Frame It* lease did not specifically require the landlord to pur-

chase insurance, it certainly contemplated such a purchase. The lease provided that the shopping center tenant would pay a pro-rata share of the lessor's operating costs which specifically included property damage insurance. To Trialco's advantage, the lease also stated that "[t]he inclusion of cost of Landlord's insurance in definition of 'operating and maintenance costs' shall not relieve Tenant of maintaining his own insurance coverage." However, other provisions which the court relied upon in reaching its conclusion were quite similar to provisions in the Trialco lease. The court stated that "[t]he provisions delineating tenant's obligation to make repairs expressly negate any assertion that the landlord has agreed to look to the insurance acquired by it as its sole source of reimbursement." The court also relied upon the provision requiring the lessee to purchase "its own public liability insurance and to assure that the landlord is covered by such a policy." Finally, the court also stated that the lease contained no exculpatory provisions, thereby denying any exculpatory effect to the insurance provisions. In view of all these comments, the court concludes that Colorado would allow a subrogation action such as that currently before the court. In this regard, Colorado stands alone among the ten jurisdictions addressing the issue in the 1980's.

### B. *Older Decisions*

Expanding the case search to jurisdictions addressing this issue before 1980 still reveals that the greater weight of authority probably supports the present defendants' claim for absolution of liability.

This court is aware of only two jurisdictions with case law strongly supporting the plaintiffs' position. In *Wichita City Lines v. Puckett,* 156 Tex. 456, 295 S.W.2d 894 (1965), the "[l]essor agree[d] to carry his own insurance against loss by fire, etc., on the entire building." Yet the Texas Supreme Court refused to give this provision any exculpatory effect, holding that such provisions would be strictly construed against release from liability. The court further noted that

[t]he provision by its terms imposed no obligation on the lessor to take out any insurance to protect himself or the lessee. No amount of insurance is stipulated nor does one find any of the specific terms to be expected if the provision was designed to protect the lessee. Furthermore, the lease provided that in the event of fire that should the lessor deem the building unfit for occupancy, he could decide not to repair but to remodel or rebuild and terminate the lease. This seems inconsistent with any intention in the insurance provision to protect the interest of the lessee.

*Id.* 295 S.W.2d at 899.

Likewise, the North Carolina Supreme Court applied a rule of strict construction to deny exculpatory effect to a similar insurance obligation in *Winkler v. Appalachian Amusement Co.,* 238 N.C. 589, 79 S.E.2d 185 (1953). And in *Winkler,* there was even a fire exception to the standard surrender and repair provisions. It should be noted, however, that the North Carolina case was decided in 1953, and the Texas case in 1965.

On the other side of the spectrum lie six jurisdictions with case law supporting the present defendants' position. Oklahoma is the most obvious. In *Sutton v. Jondahl,* 532 P.2d 478 (Okl.App.1975), an Oklahoma appeals court concluded that a tenant was a coinsured under the lessor's insurance policy despite the fact that there was not even any lease provision referring to insurance. Neither did the court rely upon any provision within the insurance contract itself. The court simply stated that there must be an express agreement to the contrary before a tenant may be liable for a negligently started fire if the owner had insurance coverage for the property.

Additionally, Ohio has long recognized the exculpatory effect associated with a lessor's purchase of insurance. In *United States Fire Insurance Co. v. Phil–Mar Corporation,* 166 Ohio St. 85, 139 N.E.2d 330 (1956), the Ohio Supreme Court evaluated a lease which assumed that the lessor would purchase insurance while not explic-

itly containing such a promise. The lease provided as follows:

> In the event that the fire insurance rate on the building on the above demised premises shall be increased by reason of lessee's occupancy thereof, then the lessee shall pay to the lessor the additional premium by reason of such increase in insurance rate for the unexpired portion of the term of the within lease on only so much of the principal amount of the fire insurance coverage on said building as does not exceed $75,000. Such additional premium shall be paid to the lessor upon its demand and upon its submission to the lessee of the proper evidences indicating such increase in rate.

The court concluded that

> [c]learly under this section of the lease it was contemplated that the lessor would carry insurance on the property and look to the insurance for compensation for any loss by fire. If the parties had intended otherwise, there would have been no reason for such provision.

*Id.* 139 N.E.2d at 333.

This construction of the insurance provision was actually used in *Phil–Mar* to support the argument that the "except fire" clause included an exception for negligently started fires. Thus, the court did not specifically state that the insurance clause by itself was enough to exonerate the tenant. However, the language strongly suggests that a clause such as the court is currently evaluating should be construed to express an intent that the parties look only to the insurance to cover any losses.

While perhaps not as clear as Ohio and Oklahoma, at least four other jurisdictions appear to support the defendants' argument. *See Mayfair Fabrics v. Henley,* 97 N.J.Super. 116, 234 A.2d 503 (1967) (tenant not liable for fire, but insurance provision in lease providing basis for decision was a little more expressly for the parties' mutual benefit); *Foster Estates, Inc. v. Wolek,* 105 N.J.Super. 339, 252 A.2d 219 (App.Div. 1969) (tenant not liable for fire, but policy required tenant to purchase insurance and deliver policy to landlord who was named

insured); *Rock Springs Realty, Inc. v. Waid,* 392 S.W.2d 270 (Mo.1965) (holding that tenant is not liable for fire relied heavily upon "except fire" clause within provision for surrender, but provision which only implied that lessor would purchase insurance was construed with strong language to the effect that insurance was presumably for the benefit of both parties); *General Cigar Co. Inc., v. Lancaster Leaf Tobacco Co.,* 323 F.Supp. 931 (D.Md.1971) (applying Maryland law, construed agreement to purchase insurance as implying agreement that loss would be covered by insurance only); *Woodruff v. Wilson Oil Co., Inc.,* 178 Ind.App. 428, 382 N.E.2d 1009, (1978) (requirement for lessor to carry fire insurance construed to be for mutual benefit of parties); *South Tippecanoe School Building Corp. v. Shambaugh & Son, Inc.,* 182 Ind.App. 350, 395 N.E.2d 320 (1979) (involved construction contract, but endorsed negligent tenants being excused from liability when lease agreement requires lessor to carry insurance).

At least three other jurisdictions have discussed the significance of lease provisions obligating one party to purchase insurance, but their position on the instant facts is unclear. *See New Hampshire Insurance Co. v. Fox Midwest Theatres, Inc.,* 203 Kan. 720, 457 P.2d 133 (1969) (strong language regarding agreement to purchase insurance as presumably for benefit of both parties substantially weakened by heavy reliance upon repair clause excepting damage by fire); *Galante v. Hathaway Bakeries,* 6 A.D.2d 142, 176 N.Y.S.2d 87 (1958) (tenant liable for negligent fire damage based upon repair obligation despite "damage by fire ... excepted" clause, but court expressly noted that there was "no lease provision requiring lessor to maintain fire insurance); *Page v. Scott,* 263 Ark. 684, 567 S.W.2d 101 (1978) (court recognized exculpation in cases of implied agreement that insurance would be provided for mutual benefit of parties, but held tenant by oral lease liable for negligent fire after noting "there is not even a suggestion that the agreement included any terms from which such an agreement could be implied").

## PUBLIC POLICY ARGUMENTS

Because Tennessee law is unclear, and because there is a split of authority among other jurisdictions, this court ultimately bases its prediction of Tennessee law on what it perceives to be the most sound public policy. *Cf. Aetna Insurance Company v. Craftwall of Idaho, Inc.*, 757 F.2d 1030, 1033 (9th Cir.1985) (certifying the question to the Idaho Supreme Court, notes "if we were to reach the question whether a tenant should be presumed to be a coinsured in the absence of any indication of the parties' intent, our decision would ultimately turn on the conflicting policy argument ...").

■ As noted earlier, ordinarily the overriding public policy to be advanced when construing contracts under Tennessee law is to carry out the intent of the parties. This court concludes that adoption of the modern rule that an agreement to purchase insurance will be presumed to be for the mutual benefit of the parties absent some clearly expressed contrary intent would further the public policy of effectuating the intent of the parties. If the parties agree that one person shall purchase insurance, it is only natural that they assume that the insurance is for their mutual benefit and that the parties will look only to the insurance for loss coverage. Otherwise, there is no reason to put the insurance clause within the lease. It would be mere surplusage. And the natural expectation of the parties is that each lease provision has meaning.

The realities of who ultimately pays for the insurance also support adoption of this rule. Despite the fact that the lessor may actually send the premium check to the insurance company, the lessee ultimately pays for insurance through his rent checks, because the lessor takes his own costs into account when setting rent. If the lessee is ultimately the source of the insurance payment, simple equity would suggest that he be able to benefit from that payment unless he has clearly bargained away that benefit. Subrogation being an equitable doctrine, it is only appropriate to consider this equitable factor in determining whether or not subrogation is appropriate in this instance. Likewise, this fits with the natural expectations of the parties since it is logical for parties to expect to benefit from what they pay for.

At least in the instant case, the insurance policy itself leaves no room for the argument that the tenant did not pay for insurance coverage for his own negligence. The policy issued by Reliance specifically gave the lessor complete freedom to release the tenant from any liability for the tenant's negligence. This power even included the right to gratuitously release the tenant from liability even after the loss had already occurred. Thus, the rates charged by the insurance company were undoubtedly increased to account for the possibility of compensating for losses caused by the tenant's negligence. The Tates were not paying only the amount of insurance necessary to cover losses not caused by the lessee's negligence. Rather, they paid additional rates to cover losses caused by the tenant's negligence as well. The resulting economic reality, therefore, is that this increased insurance rate is passed on to the lessee. As stated earlier, if the lessee pays for it, it is then only natural for him to expect benefit. Similarly, these same facts show that certainly no injustice is being worked against the insurance company. As the policy indicates, the insurance company expected to cover losses caused by the tenant's negligence.

Another less important public policy may also be advanced by the rule that an agreement to purchase insurance will be deemed to be for the mutual benefit of the parties absent a clearly expressed contrary intent. A different rule would promote multiple insurance policies on the same building by the various parties involved. This, in turn, is likely to create overlapping coverage which inevitably means more premiums paid than necessary. This economic inefficiency then results in higher costs being passed down throughout the economy.

The primary opposing public policy argument states that exculpatory agreements should be discouraged. However, as noted earlier, the provision may technically be viewed as an agreement to insure against

the loss from liability rather than as an exculpatory agreement which absolves a party from liability. Furthermore, Tennessee so strongly supports the idea of freedom to contract that this court concludes the reasonable and natural expectations of the parties must have preeminence. As already stated, this court believes that unless some contrary intent is clearly stated, parties naturally and reasonably assume that an insurance policy purchased by agreement is for the mutual benefit of both parties.

## APPLICATION OF THE RULE

■ Application of the modern rule that an agreement to purchase insurance will, absent clear contrary intent, be presumed to be for the mutual benefit of the parties mandates judgment in favor of the defendants in this case. The lease specifically states that "[t]hroughout the terms of this lease, the Lessor shall pay premiums for insurance coverage on the Building only." Thus, absent a clearly expressed contrary intent, this agreement must be presumed to be for the mutual benefit of both the lessor and lessee. The statement in the lease that "[a]ny damage caused by the Lessee shall be paid for by the Lessee" is not a clear expression of a contrary intent. This provision could very naturally have been included simply as an explanation that damage not covered by the insurance, whether to the building or to some other property, must be paid for by the lessee. Likewise, the provision could have been inserted as a preface to or explanation of the next requirement which was for the Lessee to provide a certificate of general liability insurance. The obligation to provide general liability insurance may have simply been a way for the lessor to ensure that the lessee was indeed able to pay for certain damage caused by the lessee which was not covered by the building insurance policy. It was also presumably inserted to protect the lessor from claims by third parties arising from acts of the lessee.

Likewise, general repair and maintenance obligations elsewhere within the lease are not sufficient manifestation of a contrary intent. E.g. *Alaska Insurance Co. v. RCA Alaska Communications, Inc.,* 623 P.2d 1216, 1219 n. 2 (Alaska 1981) ("we ascribe correspondingly greater significance to the insurance clause"). It is a very standard rule of construction that various provisions be construed in harmony with one another when possible. In this case, the exculpatory effect of the insurance clause may be construed in perfect harmony with all other repair or indemnity obligations. The insurance clause simply represents a bargained for arrangement whereby damage covered by insurance would be excepted from the general repair obligations of the lessee.

Application of this rule renders resort to extrinsic evidence unnecessary. Nevertheless, the court notes that there was very little extrinsic evidence of value anyway. The limited evidence available was either ambiguous or pointed in both directions. Interestingly, when the lessor was asked why he inserted the promise to "pay premiums for insurance coverage on the Building only," he expressed an awareness that "the bank ... would've requested full coverage, I'm sure." Obviously a bank's requirement of full coverage would include coverage for losses due to negligence of the tenant. Thus, this suggests that when the lessor inserted the disputed provision, he intended "insurance" to mean insurance which would also cover losses created by the lessee's negligence.

## COUNTERCLAIM

■ Having achieved the desired status of an implied coinsured, the defendants next seek damages from the insurer for its alleged unreasonable delay in repairing the damaged building. The defendants contend that this delay damaged machinery by exposing the machinery to the elements for an extended period of time. They also seek compensation for business losses suffered while allegedly forced to remain shut down for a longer period than necessary. However, both of these claims for damages are premised on the proposition that Reliance unreasonably or unnecessarily delayed repair of the building. Yet, there was no evidence of any such delay. Any delay

that occurred was caused by initial indications from Hartford, the defendants' insurer, that they would accept responsibility for the repair. When Hartford subsequently backed down, the evidence shows that Reliance promptly filled the void. Thus, the counterclaim is without merit.

■ Additionally, there was no evidence to justify the assertion that Reliance should reimburse the defendants for a $17,000 portion of the defendant's bill from Moss Electric. Apparently Hartford paid approximately $107,000 for the replacement of wiring, but other than the naked assertion itself, there was no evidence to support the claim that part of that was actually replacement of the original building. Neither the expert witness nor the Hartford adjuster who testified knew what wiring was in the original building as provided by the Tates. Consequently, this portion of the counterclaim must also be rejected without even addressing the legal questions concerning the circumstances under which Reliance would be liable for a party's apparently voluntary repair of something that Reliance might be obligated to repair.

## CONCLUSION

For the foregoing reasons, the court concludes that the Tennessee Supreme Court would adopt the modern rule that an agreement for the lessor to purchase insurance will be presumed to be for the mutual benefit of both parties unless there is a clear expression of contrary intent. Such a rule is to some degree supported indirectly by Tennessee case law recognizing the "exculpatory" effect of a promise by one party to purchase insurance. Such a rule is also supported by the persuasive authority of the majority of cases addressing this issue in other jurisdictions. At the very least, this rule is certainly the modern trend. Finally, this court also concludes that sound public policy supports this rule. When applied to the facts at hand, the rule dictates dismissal of this subrogation action because there was no clear expression on intent that the insurance be for the benefit of the lessor only. However, a

complete absence of supporting evidence also requires dismissal of the counterclaim.

An appropriate order will be entered.