## Fairchild Square Company v. Green Mountain Bagel Bakery, Inc. d/b/a Burlington Bagel Bakery, Inc., and Andrew B. Golbert

[658 A.2d 31]

No. 93-493

Present: **Gibson, Dooley, Morse and Johnson, JJ., and Crucitti, D.J., Specially Assigned**

Opinion Filed January 27, 1995

Motion for Reargument Denied March 29, 1995

434

*Sandra A. Strempel* of *Dinse, Erdmann & Clapp,* and *Arthur S. Barrett, Jr.* of *Heilmann, Ekman & Associates,* Burlington, for Plaintiff-Appellant.

*Lawrence Miller* and *Barbara R. Blackman* of *Miller & Faignant, P.C.,* Rutland, for Defendants-Appellees.

**Morse, J.** Plaintiff Fairchild Square Company, a corporate landlord renting space to defendant, Green Mountain Bagel Bakery, appeals from a Chittenden Superior Court grant of summary judgment in favor of the tenant and its employee, Andrew Golbert. The trial court held that plaintiff had waived recovery for negligently caused fire damages under the terms of the parties' lease. We affirm.

Fairchild is the owner of the Huntington Building, a four-story office and apartment structure in Burlington. Green Mountain leased the first floor of the building. Defendant Andrew Golbert was the

president of Green Mountain. One day in June 1989, Golbert failed to turn off a gas-fired water boiler before leaving the Bakery for the night. That night the boiler started a fire, causing damage to the Bakery and other parts of the Huntington Building.

Landlord sued tenant and Golbert for negligence to recover its losses. All parties moved for summary judgment. The court granted defendants' motion for summary judgment, ruling that landlord had waived any recovery against tenant and Golbert under Article 35 of the lease, which stated:

> Article 35. *Fire insurance*: It is acknowledged and understood by the parties hereto that such insurance for fire and extended coverage *as Lessor elects to purchase* shall be for the sole benefit of the lessor, and that such insurance shall not cover Lessee's personal property, trade fixtures, leasehold improvements, and other appurtenances, and that in the event of damage to or loss of any such items, Lessor shall have no obligation to repair or replace same. *Lessor and Lessee hereby release and waive all right of recovery against each other or any one claiming through or under each of them by way of subrogation or otherwise and arising out of any loss by fire or other similar casualty.*

(Emphasis added.)

On appeal, landlord argues that (1) it did not waive its right to recover for negligence; (2) even if it waived recovery for damages to the leased premises, it did not waive damages to parts of the Huntington Building not leased by tenant; and (3) even if it waived recovery as to Green Mountain, it did not waive its right to sue Golbert individually for his negligence.

## I.

■ Whether landlord waived its right to recover against tenant for negligently caused fire damage depends on the intent of the contracting parties as determined by the terms of the contract. The trial court relied almost exclusively on the final sentence of Article 35 in holding the landlord had waived the right to damages: "Lessor and Lessee hereby release and waive all right of recovery against each other or any one claiming through or under each of them by way of subrogation or otherwise and arising out of any loss by fire or other similar casualty."

Landlord, on the other hand, relies primarily on our policy with respect to exculpatory contract language as set out in *Colgan v.*

*Agway, Inc.,* 150 Vt. 373, 553 A.2d 143 (1988). Although we will enforce such language in appropriate cases, we noted in *Colgan* that it is "traditionally disfavored" and subject to "more exacting judicial scrutiny." *Id.* at 375, 553 A.2d at 145. Thus, we held that *"a greater degree* of clarity is necessary to make the exculpatory clause effective than would be required for other types of contract provisions" and that exculpatory clauses "must be construed strictly against the part[y] relying on them." *Id.* (emphasis in original).

■ The *Colgan* holding is an application of, not an exception to, traditional rules of contract construction. By these strict rules, "we are not deprived . . . of the use of common sense" in construing an exculpatory clause. *Douglass v. Skiing Standards, Inc.,* 142 Vt. 634, 637, 459 A.2d 97, 98 (1983). Indeed, only the most wooden application of the *Colgan* rule would avoid a waiver here.

Without withdrawing from the principles stated in *Colgan,* we stress that context is critical to their application. *Colgan* involved the sale of a manure storage facility to a farmer under a standard-form sales contract prepared by the seller. The contract contained a provision limiting the warranty to a term of one year and disclaiming all other warranties and "'any other obligations or liability on the part of the contractor.'" 150 Vt. at 374, 553 A.2d at 144. We held that this language did not waive the farmer's ability to sue on a negligence theory when a wall of the storage facility collapsed. *Id.* at 377, 553 A.2d at 146. Presumably, application of the exculpatory provision would have left the farmer no remedy for the seller's negligence.

The circumstances here are markedly different. Article 35 is not a warranty clause; it allocates the responsibility of purchasing fire insurance and contemplates that the parties will be reimbursed by their insurance companies for loss by fire. Except with respect to the risk of loss of the tenant's personal property and fixtures, the expectation was that landlord would purchase any needed fire insurance in the amount it deemed appropriate. This cost was necessarily built into the determination of the rent. By Article 4 of the lease, tenant was required to pay additional rent if its activities in any way increased the landlord's fire insurance costs. Landlord did, in fact, purchase fire insurance, and this is a subrogation claim by its insurance carrier.

■ Landlord urges us to look beyond the waiver sentence of Article 35 to other parts of the lease and the overall context of this dispute. This inquiry only reinforces our conclusion that landlord has

waived the right to bring this action against Green Mountain. The allocation of the risk of loss is reinforced by Article 14 of the lease, which provides:

> Article 14. *Duty to keep premises in good order*: Lessee hereby covenants and agrees to keep the premises in as good order, repair and condition as the same are in as of the commencement of the term thereof, or may be put in thereafter, *damage by fire* or unavoidable casualty and reasonable wear and tear excepted; and at the termination hereof, to peaceably yield up such premises and those additions, alterations and improvements of Lessor in such good order, repair and condition leaving the Premises clean, neat and tenantable.

(Emphasis added.) Again, we interpret the reference to fire to apply irrespective of its cause. Thus, risk of loss from fire falls on the landlord and not the tenant.

Landlord attempts to distinguish this case from those of other jurisdictions because the lease contained no specific requirement that lessor purchase fire insurance. We do not place critical significance on the absence of a lease mandate. Landlord's purchase of fire insurance was clearly contemplated by the lease, was critical to its self-protection, and actually occurred.

 Landlord's main argument is that Article 35 does not contain a waiver of its right to sue for negligently caused fire damage because the language does not use the term "negligence." We see no difficulty in finding a waiver even under the exacting *Colgan* standard. *Colgan* recognized that "a specific reference to negligence liability is not essential" to the effectiveness of a waiver provision. *Id.* at 376, 553 A.2d at 146. Under the Article 35 language, landlord and tenant specifically waive "*all* right of recovery . . . arising out of *any* loss by fire or other similar casualty." (Emphasis added.) There is no suggestion of a limitation based on fire resulting from negligence. See, e.g., *Chazen v. Trailmobile, Inc.*, 384 S.W.2d 1, 4 (Tenn. 1964) (construing waiver sentence nearly identical to Article 35 and concluding that use of "any" and "all" included negligently started fires).

 Landlord argues that the phrase "loss by fire" is modified by the phrase "other similar casualty," and because "casualty" refers to accidents or other events not caused by negligence, the phrases read together indicate a waiver of fire damage not caused by negligence, i.e., accidental fires only. Such a strained reading contravenes the

meaning of the phrase "loss by fire." See *United States Fire Ins. Co. v. Phil-Mar Corp.*, 139 N.E.2d 330, 332 (Ohio 1956) (ordinary meaning of "loss by fire" "is damage resulting from fire caused by act of God, accident *or negligence*") (emphasis added).

■ Landlord's arguments based on other provisions of the lease are similarly unpersuasive. Primarily, landlord relies upon the fact that Articles 12[1] and 21[2] of the lease specifically establish tenant's liability for its negligence or that of its agents or employees. Although this is the general undertaking of the lease, the parties established different rules for fire damage. As a matter of contract construction, the specific controls the general. *Parkhurst v. Gibson*, 573 A.2d 454, 458 (N.H. 1990) ("generally accepted interpretive rule is that a general, preliminary clause should not ordinarily take precedence over specific provisions of a contract") (citing 4 S. Williston, A Treatise on the Law of Contracts § 619 (3d ed. 1961)); cf. *Jackson v. Rogers*, 120 Vt. 138, 141, 134 A.2d 620, 622 (1957) ("a special provision will be held to override a general provision . . . where the two cannot stand together"). Therefore, Article 35 controls Articles 12 and 21 with respect to liability for fire, whatever its cause. In fact, the specific reference to negligence in the earlier lease provisions is a further indication that the parties knew how to spell out negligence liability,

---

[1] Article 12 provides in relevant part:
Article 12. *Lessee's Liability*:

. . . .

(b) Lessee for itself, its successors and assigns, hereby agrees to indemnify and save harmless Lessor, its successors and assigns, from and against any and all loss, cost, damage or expense, including reasonable attorney's fees, arising out of or in connection with any negligent act by Lessee or its agents or employees.

(c) Lessee's liability is limited to responsibility for its negligence and the negligence of its employees to the extent that such liability of Lessee is insured in accordance with the insurance requirements set forth in Article 31 [sic] hereof. Lessor accepts such insurance in lieu of any further liability of Lessee.

[2] Article 21 provides in relevant part:
Article 21. *Lessee's Obligations*: Lessee covenants and agrees as follows:

. . . .

(c) that, without limitation of any other provision herein, the Lessor and its employees shall not be liable for any injuries to any person or damages to property . . . due to the happening of any accident in or about the Building or the Premises or due to any act or neglect of any lessee . . . or any employee or visitor of any lessee. . . . Provided however, that the Lessor shall be liable for its negligence and the negligence of its employees to the extent that the liability of the Lessor is insured by virtue of a general comprehensive Lessor's public liability insurance policy, which the Lessor agrees to maintain on the Building.

and were equally able to spell out an exemption for negligence in the Article 35 waiver clause had they so desired.

We also reject landlord's argument that summary judgment was inappropriate because the lease is ambiguous as to whether the parties intended exculpation for negligently caused fire damages. We find the language of the lease to be sufficiently unambiguous so that it should be enforced according to its terms. See *In re New England Tel. & Tel. Co.*, 159 Vt. 459, 466, 621 A.2d 232, 237 (1993) (plain meaning of contract enforced when contract language is clear and unambiguous).

## II.

Landlord's second argument — even if it waived recovery for damages to tenant's leasehold, it did not waive recovery for damages to other property within the Huntington Building not leased by tenant — is also rejected. Although other courts have accepted that position in the context of the specific lease provision before them, see, e.g., *Sannit v. Aarons*, 297 F. Supp. 798, 800 (D. Del. 1969) (even if surrender clause would protect defendant from liability claim for damages to leased premises, "no conceivable reason" to extend protection to shield tenant from liability to adjoining premises), we reject this argument for two reasons.

First, a limitation to the leased premises is not supported by the language of Article 35. The waiver provision applies to "any loss by fire" with no limitation to the leased premises. Just as the plain meaning of the language determined the result with respect to negligence liability, we believe it also commands a similar result for parts of the building that are not included in the lease.

Second, the limitation to the leased premises is not consistent with the insurance obligations assumed by the parties. On this point, we agree with the analysis of the Utah Supreme Court in a similar case:

Fundamental to an analysis of the covenant requiring the tenant to be liable for all damages except those caused by fire is the assumption based on common experience, that the landlord itself keeps the premises insured against that type of loss. . . . [T]he parties understood that the landlord (plaintiff) was paying the fire insurance premiums on the entire premises. It certainly would be discordant to common

> sense to suppose that the landlord insured only the deceased's apartment against loss by fire. The only logical view is that such insurance coverage would indemnify the landlord for damages to any part of its building or premises caused by fire and that this is the reason for so exempting the tenants.

*Bonneville on the Hill Co. v. Sloane*, 572 P.2d 402, 403-04 (Utah 1977). The juxtaposition of the issues in Article 35 of the lease shows that the parties contemplated that the waiver of liability would flow from assumption of the responsibility to purchase fire insurance. It does not make sense to hold the tenant responsible for damage to nondemised premises even though landlord would purchase fire insurance to cover these premises.

We must, however, consider landlord's argument that this issue was resolved in its favor in *Manchester Marble Co. v. Rutland R.R.*, 100 Vt. 232, 136 A. 394 (1927). Although *Manchester Marble* also involved an exculpatory provision of a lease, the plaintiff was a tenant that had leased part of defendant railroad's right-of-way to construct a factory shed next to the track. A fire allegedly caused by the defendant's negligence burned down the shed as well as the plaintiff's main factory, which was not located on the defendant's land. The defendant argued that it was released from liability for damage to the plaintiff's property, whether on or off the leased premises. The Court rejected this argument, finding "that the contract . . . does not include by its terms any property that is outside the right of way," *id.* at 240, 136 A. at 397, and reasoning that the defendant's reading of the lease "would be an unreasonable construction, and would put a meaning to the contract that was not contemplated by the parties when they executed the lease." *Id.* at 245, 136 A. at 399.

*Manchester Marble* might govern if the tenant were suing for fire damage to another building, owned by the tenant, and claiming the landlord had been negligent in starting the fire. In such a case, the tenant would be entitled to rely on the rule that a "lease will be most strongly construed against the . . . lessor." *Id.* at 242, 136 A. at 398. Here, the construction rule supports the application of the waiver. The lease provisions are different and are specifically related to a very different set of insurance expectations. Although the highly unlikely scenario set forth above was beyond the contemplation of the parties in *Manchester Marble*, that cannot be said for the likely event that a fire in the Bakery would spread to other parts of the building

in this case. We find that *Manchester Marble* does not control this case and does not undercut our conclusion.

### III.

It follows from the discussion in parts I and II that landlord's third and final argument — even if landlord waived recovery as to Green Mountain, it did not waive its right to sue defendant Golbert individually for his negligence — must fail.

First, there is no question that this provision was intended to distribute the risk of loss by fire in a predictable way so that two commercial entities could insure against potential harm in the most logical and economic way. To accomplish that purpose, each party waived all recovery against the other, and specifically waived rights of their subrogees as to the other party. Consequently, we believe that the last sentence of Article 35 shows that Fairchild and Green Mountain intended that, upon payment of a fire insurance premium, their respective fire insurers would ultimately assume their respective risk of loss. The absence of an express reference to employees does not alter the purpose of the clause or shake our conviction that the parties intended that their fire insurers would assume the ultimate risk. See *Mayfair Fabrics v. Henley*, 244 A.2d 344, 351 (N.J. Super. Ct. 1968) (tenant's employee entitled to limitation of liability despite lack of explicit language).

Second, corporate employers are not responsible for damages unless a person covered by the doctrine of respondeat superior is negligent. In every case of such liability against a corporation, an employee or other agent must have caused the harm. Only people cause corporations to be responsible legally. Landlord obviously must have contemplated that fires might result from the negligence of tenant's employees. In this regard, we agree with the trial court's assessment: "To the extent any claim can be made against a corporate tenant for negligence in causing a fire, such negligence must have been committed by one or more human beings. Corporations cannot act except by the people who staff them." See *In re McGrath*, 138 Vt. 77, 80, 411 A.2d 1362, 1364 (1980) (corporations act through agents). In short, the essential purpose of Article 35, looking solely to insurance for recovery, would be significantly undermined by denying employees the insulation from liability provided their employers.

In conclusion, underlying public policy considerations support our determination. The court in *Tate v. Trialco Scrap, Inc.*, 745

F. Supp. 458 (M.D. Tenn. 1989), found that fire insurance purchased by the landlord, under a contractual obligation to do so in the lease, was for the mutual benefit of landlord and tenant. The trial court quoted from *Tate* that the modern trend has been to prevent landlords from suing tenants for negligently caused fire damage "unless the rental contract clearly expresses a contrary intent." *Id.* at 467. This reference caused landlord to argue that the trial court impermissibly shifted the burden of proof onto it in this case. The reference correctly stated the trend of the law and was not determinative of the outcome. Although the rule in *Tate* is inapplicable here because there is no contractual obligation for the landlord to purchase fire insurance, we nonetheless find the policy arguments persuasive:

> If the parties agree that one person shall purchase insurance, it is only natural that they assume that the insurance is for their mutual benefit and that the parties will look only to the insurance for loss coverage. . . .
>
> The realities of who ultimately pays for the insurance also support adoption of this rule. Despite the fact that the lessor may actually send the premium check to the insurance company, the lessee ultimately pays for insurance through his rent checks, because the lessor takes his own costs into account when setting rent. If the lessee is ultimately the source of the insurance payment, simple equity would suggest that he be able to benefit from that payment unless he has clearly bargained away that benefit. . . .
>
> . . . .
>
> Another less important public policy may also be advanced by the rule that an agreement to purchase insurance will be deemed to be for the mutual benefit of the parties absent a clearly expressed contrary intent. A different rule would promote multiple insurance policies on the same building by the various parties involved. This, in turn, is likely to create overlapping coverage which inevitably means more premiums paid than necessary. The economic inefficiency then results in higher costs being passed down throughout the economy.

*Id.* at 473. Multiplicity of insurance policies and overlapping coverage in commercial settings is economically inefficient and results in higher overall costs. *Id.* The parties here intended to avoid overlapping coverage. Under the lease, tenant was to insure the contents of the

leased premises, and landlord was to insure the building as a whole. The dissent's approach would subvert bargained for economic efficiency and equitable allocation of risk by requiring all employees who want protection to obtain insurance covering the entire building.

*Affirmed.*

**Dooley, J.,** concurring and dissenting. I concur in parts I and II of the majority opinion. Because the lease does not provide for a waiver of liability against officers or employees of Green Mountain, I dissent from the holding in part III of the majority opinion that plaintiff cannot proceed against Andrew Golbert. The majority is persuasive in its conclusion that the lease should have extended the waiver to employees and officers of the defendant, and that it will be less effective if it failed to do so. It is unpersuasive that the lease actually contains the extended waiver. It is not our role to create a better contract for a business-lessee than it failed to do for itself.

Both parts I and II of the majority opinion are grounded in our obligation to enforce the plain meaning of the language of the lease. That cardinal rule of contract construction is totally missing from part III. The parties to the Article 35 waiver of liability are "Lessor" and "Lessee," which, by the terms of the lease, mean only Fairchild Square and Green Mountain. Compare *Home Ins. Co. v. National Tea Co.*, 588 So. 2d 361, 363 (La. 1991) (otherwise similar waiver sentence covers "agents, successors and assigns"); *Alliance Ins. Co. v. First Tape, Inc.*, 713 S.W.2d 718, 719 (Tex. Ct. App. 1986) (exculpatory provision covered "agents, officers, and employees"). Article 12(b) of the lease specifically imposes liability for any loss caused by "any negligent act by Lessee or its agents or employees." Thus, the drafters clearly applied liability to acts of employees but failed to include employees within the waiver provision. Reinforcing that the drafter knew how to immunize employees from liability, when that result was intended, Article 21(c) immunizes the "lessor and its employees" from liability for injuries caused by disrepair of the building.

I agree with the majority that "public policy considerations support" the result it wants to reach. My view does not, however, "subvert bargained for economic efficiency and equitable allocation of risk" as claimed by the majority. It refuses to allow unbargained-for immunity to be created just because this Court likes the result. We should enforce the contract that was made, not one we wish they made. I am authorized to say that Justice Gibson joins in this dissent.