2006 VT 87

### The Travelers Indemnity Company of America v. Bruce Deguise and Kristy Deguise

[914 A.2d 499]

No. 05-353

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed August 18, 2006

___
considering various contractual provisions, agreed. *City of Greensboro*, 321 S.E.2d at 236-37.

*A. Jeffry Taylor* of *Abatiell Associates, P.C.*, Rutland, for Plaintiff-Appellee.

*Paul R. Morwood,* South Burlington, for Defendants-Appellants.

¶ 1. **Burgess, J.** In this subrogation action, plaintiff ("insurer") seeks to recover from defendants ("tenants") the amount it paid under its fire insurance policy with tenants' landlord as a result of a fire in tenants' apartment. The superior court granted summary judgment in favor of insurer, denied tenants' cross-motion for summary judgment, and — because tenants' negligence and the amount of damages were uncontested — entered judgment for insurer. Tenants argue on appeal that the superior court erred in concluding they were not implied coinsureds under landlord's insurance policy. We affirm.

¶ 2. We review the trial court's grant of summary judgment de novo, applying the same standard as the trial court. *Hardwick Recycling & Salvage, Inc. v. Acadia Ins. Co.*, 2004 VT 124, ¶ 14, 177 Vt. 421, 869 A.2d 82. Summary judgment is appropriate where the undisputed facts demonstrate that either party is entitled to judgment as a matter of law. V.R.C.P. 56(c)(3).

¶ 3. The undisputed facts can be briefly summarized. Tenants, pursuant to a written agreement, leased an apartment in the Northgate/Greenfield Apartments in Burlington from landlord Northgate Housing Limited Partnership. The apartment is one of several in a multi-unit building in a multi-building complex. Tenants admitted that, on January 6, 2002, they emptied smoldering materials from an ashtray into a trash can or wastebasket, causing a fire that damaged their apartment. As a result of a claim filed by landlord with insurer, insurer paid $10,711.66 for property damaged by the fire.

¶ 4. The legal question posed by tenants on appeal — whether a tenant is an implied coinsured under a landlord's fire insurance policy — is one we recently addressed in another decision, albeit under different factual circumstances. See *Town of Stowe v. Stowe Theatre Guild*, 2006 VT 79, ¶ 7, 180 Vt. 165, 908 A.2d 447 (affirming trial court's conclusion that nonprofit theater group leasing performance space in town building under oral lease was not implied coinsured under town's fire insurance policy on the building). As we stated in *Stowe Theatre Guild*, an insurer in a subrogation action stands in its insured's shoes when seeking to recover amounts the insurer has paid its insured as a result of a third party's tortious conduct. *Id.* ¶ 5. Our analysis in *Stowe Theatre Guild*, as in this case, was guided by our decision in *Union Mutual Fire Insurance Co. v. Joerg*, where we concluded that "a tenant's liability to the landlord's insurer for negligently causing a fire depends on the intent and reasonable expectations of the parties to the lease as ascertained from the lease as a whole." *Union Mut. Fire Ins. Co. v. Joerg*, 2003 VT 27, ¶ 8, 175 Vt. 196, 824 A.2d 586.

¶ 5. In *Joerg*, we held that where the lease required the landlord to carry fire insurance on the premises, the insurance was for the mutual benefit of the parties and the tenant was therefore deemed a coinsured and protected against an insurer's subrogation claim. 2003 VT 27, ¶ 11. While an express requirement in a lease that a landlord procure insurance is not necessary to a finding that the parties agreed a tenant would not be responsible for particular damages covered by insurance, the approach we adopted in *Joerg* requires an examination of the lease agreement to determine whether the terms reflect that landlord intended to limit its own recovery against tenants, to relieve tenants from their traditional tort obligations, or to procure insurance for the parties' mutual benefit.

¶ 6. Tenants rely primarily on a lease provision titled "Hazards," which states that tenants "shall not undertake, or permit [their] family

or guests to undertake any hazardous acts or do anything that will increase the development's insurance premiums."[1] Tenants argue that while the provision does not expressly obligate either party to maintain insurance, the provision sufficiently demonstrates the parties' implied expectation that landlord would maintain an insurance policy.

¶ 7. The superior court concluded that the "Hazards" provision neither created an obligation on the part of landlord to procure insurance nor implied that insurance would be procured for tenants' benefit, and that other provisions in the lease did not support a conclusion that tenants would not be held responsible for fire damage. Rather, the court concluded that any obligation stemming from the "Hazards" provision is on tenants, not landlord. The court categorized and rejected tenants' argument as based on an erroneous assumption that any mention of an insurance policy is enough to create reliance in tenants and a presumption that insurance costs would be passed on to them.

¶ 8. We agree with the superior court that the mere mention of insurance in the "Hazards" provision of the lease is insufficient to overcome other express provisions in the lease that clearly outline tenants' responsibility to pay for damages caused by their negligence. Even if tenants might have had a reasonable expectation that landlord would procure some kind of insurance on the building, there is nothing in the "Hazards" provision that would lead tenants to expect that the presence of insurance would relieve them of their responsibility to pay for damages caused by their negligence. The lease provides that the landlord may retain tenants' security deposit to the extent necessary to pay for damages beyond normal wear and tear and also specifies that tenants are "responsible . . . for paying all charges required by Section 11." Section 11, titled "Damages," provides that "[w]henever damage is caused by carelessness, misuse, or neglect on the part of the Resident,

---

[1] The full provision reads as follows:

The Resident shall not undertake, or permit his/her family or guests to undertake any hazardous acts or do anything that will increase the development's insurance premiums. If the unit is damaged by fire, wind, or rain to the extent that the unit cannot be lived in and the damage is not caused or made worse by the Resident, the Resident will be responsible for rent only up to the date of the destruction. Additional rent will not accrue until the unit has been repaired to a livable condition.

a member of the Resident's household, or guests, the Resident agrees to pay . . . [t]he cost of all repairs . . . [and] [r]ent for the period the unit is damaged, whether or not the unit is habitable."

¶ 9. Tenants support their argument by citation to *United States Fire Insurance Co. v. Phil-Mar Corp.*, 139 N.E.2d 330 (Ohio 1956), which, tenants argue, held a lease provision "similar" to the "Hazards" provision in the instant case sufficient to deny an insurer's subrogation claim. Tenants' reliance on *Phil-Mar* is misplaced. While tenants here rely solely upon the "Hazards" provision to bar subrogation, the primary question before the Ohio Supreme Court was whether the surrender clause of a lease, which excepted "loss by fire" from the lessee's duty to surrender the premises in good condition at the expiration of the lease, included circumstances where the fire loss was due to the lessee's negligence. *Id.* at 331. The *Phil-Mar* court also considered a provision that held the lessee responsible for increased fire insurance premiums if the rate was increased because of the lessee's occupancy to be indicative of an understanding that the lessor would look to the insurance for compensation. The court viewed that provision, however, in accordance with the lease as a whole — including the fact that the "loss by fire" exception in the surrender clause was "unqualified and unlimited" — to conclude that the purpose of the "loss by fire" exception was to relieve the lessee from its common law liability to the lessor for fire loss. *Id.* at 333. In contrast, the "Hazards" provision tenants rely on in this case to bar their responsibility for negligently-caused fire damage expressly relieves a tenant from payment of rent when the unit is damaged by fire and cannot be lived in — but only when "the damage is not caused or made worse by the [tenant]." See *supra*, ¶ 6 n.1. Hence, there is nothing unqualified or unlimited in this lease with regard to when the lessee is relieved from financial responsibility for damages to the leased premises.[2]

---

[2] The dissent interprets the lease agreement differently, based in large part on its conclusion that a provision in the lease conveys an "ownership interest" to tenants through their participation in a "Residents' Association," an argument not raised below or argued by tenants. See *post*, ¶ 15. The particular clause referenced by the dissent appears to relate to the tenants having a voice in the governance and management of the apartments, rather than the tenants' actual ownership of or equity interest in the building. Notwithstanding the language in that provision imparting some co-responsibility of tenants to the community, this co-responsibility is not inconsistent with a tenant's liability for negligent damage to the building. We disagree that this provision renders the damages provision of "secondary importance." *Post*, ¶ 16. The "ownership" provision is not relevant to the inquiry here,

¶ 10. Tenants also argue that we should be guided by public policy considerations we discussed in *Joerg* to conclude that tenants are implied coinsureds, arguing that landlord here would certainly take its insurance costs into account when setting rent. See *Joerg*, 2003 VT 27, ¶ 10 (concluding that, where landlord is obligated to purchase insurance, landlord would take insurance cost into account in setting rent, and economic inefficiency of multiple insurance policies would thus be prevented). Unlike the lease in *Joerg*, however, this lease does not place an insurance obligation on landlord. The parties' agreement spans twenty-one pages with numerous provisions establishing each party's obligations in great detail. The lease here, in express and unqualified language, obligates tenants to pay for the damage caused by their negligence. In reviewing the lease as a whole, we cannot imply from the provisions that landlord intended to obligate itself to provide insurance for the benefit of tenants or to relieve tenants from liability for negligently damaging the leased premises, and we find nothing in the language of the lease that would reasonably lead tenants to imply a contrary intent. While public policy considerations are helpful in balancing the equities of the parties in light of the agreement they reached, we cannot elevate public policy considerations to override or contradict the terms of the parties' agreement. It is the role of courts to enforce the contract the parties made, "'not one we wish they made.'" *Joerg*, 2003 VT 27, ¶ 9 (quoting *Fairchild Square Co. v. Green Mountain Bagel Bakery, Inc.*, 163 Vt. 433, 444, 658 A.2d 31, 38 (1995) (Dooley, J., dissenting)).

¶ 11. Finally, tenants claim that the circumstances of this particular housing development make any subrogation claim by an insurer inequitable because no one would expect a low-income tenant to purchase liability insurance. See *Norfolk & Dedham Fire Ins. Co. v. Aetna Cas. & Sur. Co.*, 132 Vt. 341, 346, 318 A.2d 659, 662 (1974) ("The subrogee must have clear equity and subrogation is defeated by countervailing equities."). We first note that tenants' argument that "to hold that [tenants] agreed to waive the benefit of [landlord's] insurance is inconsistent with the reality of their circumstances" misconstrues the relevant "waiver" inquiry. As we have discussed, the first question is

---

which is whether, through the terms of the lease, the landlord is deemed to have waived tenants' common law liability for negligently causing fire damage to the building. We do not find the alleged "ownership" provision to create any ambiguity in the lease on this issue.

whether the parties' agreement reflects a mutual expectation that landlord's insurance was procured for landlord's and tenants' mutual benefit, or whether the *landlord* waived its right to recover damages from tenants. See *Fairchild Square*, 163 Vt. at 436, 658 A.2d at 33 ("Whether landlord waived its right to recover against tenant for negligently caused fire damage depends on the intent of the contracting parties as determined by the terms of the contract.").

¶ 12. Tenants' argument is essentially that other residents in the apartment complex occupy a government-subsidized apartment (although tenants do not), and it would be inequitable to expect low-income tenants to procure their own insurance or to have adequate bargaining power when negotiating lease agreements. Although tenants advanced this argument below in their memorandum in support of their motion for summary judgment, the superior court did not address it. Nonetheless, we cannot conclude that it is the role of this Court to rewrite the parties' agreement solely because this landlord rents apartments to persons of low income and presumably limited ability to bargain on lease terms. The parties here filed cross-motions for summary judgment, and neither responded to the other that any facts were in dispute. Tenants' factual statement submitted with their summary judgment motion contains no facts to indicate the income or relative bargaining power of these particular defendant-tenants. Where tenants have failed to present any facts in their motion to support their argument that it would be inequitable to hold them to the terms of their lease agreement, we decline to consider this argument.

¶ 13. For all the foregoing reasons, we conclude on the undisputed facts in this record that tenants are not implied coinsureds under landlord's fire insurance policy. Accordingly, we affirm the superior court's grant of summary judgment for insurer and its denial of tenants' cross-motion for summary judgment.

*Affirmed.*

¶ 14. **Johnson, J.,** dissenting. In *Union Mutual Fire Insurance Co. v. Joerg*, we declined to adopt a per se rule regarding insurers' subrogation claims against tenants. Instead, we chose to adopt a "case-by-case approach," where the status of the tenant as an express or implied coinsured under the landlord's insurance policy is "ascertained from the terms of the lease." *Joerg*, 2003 VT 27, ¶ 9, 175 Vt. 196, 824 A.2d 586. Here, viewing the lease as a whole, it appears that both parties to the lease would reasonably have expected tenants to be coinsureds

under landlord's fire insurance policy. Accordingly, I respectfully dissent.

¶ 15. The majority's summary of the material facts and its statement of the relevant legal standard are entirely adequate. I take issue only with its analysis of the lease, which I view as a more unified statement of the relationship between landlord and tenants than does the majority. As the majority points out, *Joerg* contemplates an analysis of the parties' reasonable expectations, and this analysis must include an examination of the lease as a whole. See *ante*, ¶ 5 (stating that "the approach we adopted in *Joerg* requires an examination of the lease agreement"). The lease is instructive of more than the meaning of the clauses highlighted by the parties and examined by the majority, especially given the lease's reference to tenants' part ownership of the Northgate development, which the majority does not consider.

¶ 16. The majority focuses its attention, understandably, on the two provisions of the lease highlighted by the parties: the "Hazards" provision that refers to the development's insurance premiums, and the "Damages" provision that holds tenants responsible for damage caused by their negligence. My interpretation of these clauses is quite different from the majority's, as I will explain below, but these clauses are of secondary importance when the lease is examined as a whole. Instead, my interpretation begins with the opening paragraph of the lease, which states in relevant part:

> Although the relationship between Owner and Resident at Northgate/Greenfield Apartments ("Northgate") is that of Landlord and Resident, the Resident understands that the Residents at Northgate, through the Northgate/Greenfield Residents' Association (the "Residents' Association") have substantial say in the management of Northgate, and that the Residents' Association is a part owner of the Managing General Partner ("Northgate Housing, Inc.") of the Partnership which owns Northgate. The Residents' Association also has the right to elect a number of the Directors to the Board of Northgate Housing, Inc.
>
> Accordingly, the Resident understands and agrees that he/she has a special responsibility to assist in and promote the sound maintenance, operation and financial health of Northgate and the well being of the Northgate community.

This paragraph, found under the heading, "Parties to this Agreement," appears to have at least three purposes. First, in a technical sense, it recognizes that each resident of the development has an ownership interest in the development. Second, it notifies new residents of the existence of a "community" that contains both the development's residents and its owners, and appears to put the residents and the owners on a more equal footing than the typical landlord and tenant. Third, it balances the elevated status of the development's residents with a broad reciprocal duty of each resident to protect the interests of the community.

¶ 17. Each of these purposes is relevant to the question of subrogation. This is especially true of the first purpose listed above. Upon signing the lease, tenants became members of an association that the lease identifies as a "part owner ... of the Managing General partner ... of the Partnership which owns Northgate." If we take this clause of the lease seriously, this should end our analysis. The insurance policy at issue insures landlord Northgate Housing Limited Partnership — i.e., "the Partnership which owns Northgate." As part owners of that partnership's managing general partner, the Residents' Association — and, thus, the development's residents — are also seemingly covered by the insurance policy. Thus, insurer cannot bring a subrogation action against tenants, as "'an insurer cannot recover by means of subrogation against its own insured.'" *Joerg*, 2003 VT 27, ¶ 6 (quoting *Peterson v. Silva*, 704 N.E.2d 1163, 1164 (Mass. 1999)).

¶ 18. In my view, we are bound to give as much meaning to this clause as we give to the two clauses relied upon by the parties and the majority. First, as I address below, *infra*, ¶¶ 23-25, this is a boilerplate contract that must be construed against its drafter, and it would hardly be fair to give more weight to language appearing to benefit landlord than to language benefitting tenants. Second, and more importantly, landlord's intent in granting the Residents' Association an ownership interest in the development, as stated in the lease, was in part to imbue the residents with a sense of their "special responsibility to assist in and promote the sound maintenance, operation and financial health" of the development. In other words, the purported ownership interest is not an empty or symbolic promise of elevated status, but rather, one side of a bargain between landlord and tenants.

¶ 19. It is in light of this bargain that we should examine the "Hazards" paragraph of the lease, upon which tenants rely to prove the reasonableness of their expectation that landlord would look to an insurance policy for recovery of its costs in case of fire. As the majority

points out, that paragraph does not explicitly require landlord to carry fire insurance. Instead, it requires tenants to help ensure that the development's insurance premiums do not increase. This is entirely consistent with my interpretation of the first paragraph of the lease. It is the kind of obligation that fits within the residents' "special responsibility" to the development, and it reinforces the notion that the residents of the development are members of a cooperative community. The clause refers to *"the development's* insurance premiums" (emphasis added). This is more accurate than calling them landlord's premiums, not only because the residents are part owners of the development, but also because, as we stated in *Joerg,* "the landlord will take the cost of the insurance into account when setting rent." *Joerg,* 2003 VT 27, ¶ 10. For both reasons, each resident of Northgate can be presumed to benefit from lower insurance premiums, and tenants' responsibility to take care to keep premiums low can be seen as an obligation to the community as much as an obligation to landlord.

¶ 20. Thus, it is almost beside the point that a reasonable tenant would certainly have expected from the lease's reference to the development's insurance policy that such a policy would exist, and that landlord would pay the premiums. See *Houle v. Quenneville,* 173 Vt. 80, 86, 787 A.2d 1258, 1262 (2001) ("In construing contracts, we must conclude that the parties included provisions for a reason."). Nevertheless, this clause alone appears sufficient to deny a subrogation claim against tenants. As the majority points out, "an express requirement in a lease that a landlord procure insurance is not necessary" to deny a subrogation claim. *Ante,* ¶ 5. In fact, the mere mention of the development's insurance policy implicates the policy considerations of *Joerg's* rule to nearly the same extent as if the lease had expressly stated that landlord must carry insurance.[3] *Joerg* presents three public policy

---

[3] It is important to keep in mind that subrogation is an equitable doctrine based on principles of restitution and unjust enrichment. *Joerg,* 2003 VT 27, ¶ 6. "The legal principle of subrogation is a fluid concept depending upon the particular facts and circumstances and based on natural justice of placing the burden of bearing a loss where it ought to be, without the form of a rigid rule of law." 16 L. Russ & T. Segalla, Couch on Insurance § 222:24, at 222-55 (3d ed. 2000) (cited with approval in *Nationwide Mut. Fire Ins. Co. v. Gamelin,* 173 Vt. 45, 52, 786 A.2d 1078, 1084 (2001)). As such, in contrast to the limited role of public policy in the interpretation of a run-of-the-mill contract, the policy considerations underpinning our decision in *Joerg* are critically important to any interpretation of a lease in a subrogation action. A decision

reasons for adopting the rule that a landlord's obligation to carry insurance is "determinative on the issue of subrogation":

> First, if the landlord and tenant agree that one of the parties will purchase insurance, it is only natural that they assume that the insurance is for their mutual benefit and that the parties will look only to the insurance for loss coverage. Second, where the lease expressly requires the landlord to maintain insurance on the premises, the landlord will take the cost of the insurance into account when setting rent. Therefore, since the lessee ultimately pays for insurance through his rent checks[,] simple equity would suggest that he be able to benefit from that payment unless he has clearly bargained away that benefit. Finally, this rule prevents the economic inefficiency that would result from having multiple insurance policies — with multiple premiums — on the same building.

*Joerg*, 2003 VT 27, ¶ 10 (quotations and citations omitted). I have already addressed the second policy consideration; the assumption that tenants' rent incorporates the development's insurance premiums is only strengthened by tenants' ownership interest in, and "special responsibility" toward, the development. Moreover, "simple equity would suggest that [tenants] be able to benefit" from landlord's payment of insurance premiums that tenants were obliged to keep from increasing. *Id.*

¶ 21. The first and third policy considerations listed in *Joerg* are implicated just as clearly by an explicit *reference* to a pre-existing insurance policy as by an explicit *requirement* that landlord purchase insurance. It is not difficult to imagine what would have taken place if tenants had asked about the "Hazards" provision before signing the lease: tenants would have asked what "the development's insurance premiums" referred to; landlord's representative would have explained the existing insurance coverage for the development; and tenants would have concluded that they did not need to purchase fire insurance, just as they would have if the lease contained an insurance requirement. Tenants would have been understandably surprised if the response to their query had been that the clause actually meant "the development's insurance premiums, *if any*," and that the development was not actually insured against fire.

---

on a question of equity that runs counter to the demands of public policy is a contradiction in terms.

¶ 22. In light of tenants' status as part owners of the development, it is not necessary to explain away the "Damages" clause of the lease, but it should be pointed out that such a clause does not answer the question of whether subrogation should be allowed. *Joerg* holds that a provision requiring the landlord to carry fire insurance is "determinative" of that question. *Id.* Although *Joerg* does not address circumstances where a lease contains such a provision, but also contains a provision like the "Damages" clause here, its unequivocal statement implies that the insurance provision would control in those circumstances — otherwise, such a provision would not be "determinative." At least one court adopting the rule we stated in *Joerg* has reached the same conclusion. See *Rausch v. Allstate Ins. Co.*, 882 A.2d 801, 814-16 (Md. 2005) (recognizing *Joerg* as representative of the "case-by-case" approach to subrogation, and stating that when a lease contains both an insurance requirement and a liability-for-negligence provision, the insurance requirement controls and blocks subrogation). The *Rausc* court stated, after adopting our holding in *Joerg*:

> If, under the lease or by some other commitment, the landlord has communicated to the tenant an express or implied agreement to maintain fire insurance on the leased premises, absent some compelling provision to the contrary, the court may properly conclude that, notwithstanding a general "surrender in good condition" or "liability for negligence" clause in the lease, their reasonable expectation was that the landlord would look only to the policy, and not to the tenant, for compensation for fire loss covered by the policy. That expectation would constitute an implied commitment in the lease to relieve the tenant of liability to the extent of the policy coverage and it, too, would therefore preclude a subrogation claim.

*Id.* at 816. This statement in *Rausch* is consistent with our holding in *Joerg* and is applicable to the lease at issue here. The "Hazards" provision is nothing if not an "implied agreement to maintain fire insurance on the leased premises," and the "Damages" provision is plainly "a general ... 'liability for negligence' clause." *Id.* As *Rausch* suggests, the two clauses can be read consistently with one another, provided that we consider the "Damages" provision as protection for landlord in case it cannot recover the full costs of repairs through insurance.

¶ 23. Such a reading is appropriate in light of basic contract interpretation principles requiring us to construe ambiguities against the drafter of a contract, especially a contract such as this. We may assume that this residential lease was not the product of full and fair negotiation between two parties of similar bargaining power. The reality for most residential tenants, and particularly tenants in low-to-moderate-income housing such as the development at issue here, is that leases are entered into on a "take-it-or-leave-it" basis, and the tenant typically has neither the opportunity nor the legal sophistication to bargain for an anti-subrogation clause. Moreover, landlords, especially those owning large, multi-unit complexes like this one, generally draft leases with little to no input from the tenants. Therefore, these leases are essentially contracts of adhesion, as opposed to traditional contracts resulting from arms-length negotiation among evenly positioned parties.

¶ 24. This assumption is confirmed by the specific circumstances of this development, where some of the apartments are set aside specifically for low-income residents who receive government rent subsidies. The lease itself states that certain of its clauses are required by federal and state regulation, and that its terms cannot be modified without prior approval by multiple government agencies, at least with respect to tenants in the subsidized apartments. The lease tenants signed was not tailored to their situation. It appears to be the same lease offered to low-income tenants; some terms apply only to "Section 8 Residents," while others apply to all residents. Simply put, the tenants signed a boilerplate lease, and we can assume that there was little or no bargaining about its specific terms.

¶ 25. Under these circumstances, it is only fair that ambiguities in the lease be resolved against landlord, and thus, against insurer. See *Windsor at Seven Oaks v. Kelly*, 448 N.E.2d 251, 253 (Ill. App. Ct. 1983) ("[W]here a landlord has drafted the lease, a court will not impose a responsibility upon the tenant unless the circumstances and the contract clearly indicate that the tenant intended to assume such a responsibility."); see also *Garneau v. Curtis & Bedell, Inc.*, 158 Vt. 363, 367, 610 A.2d 132, 134 (1992) (ambiguity in insurance contract drafted by party in superior bargaining position must be construed against drafter); *Viles v. Vermont State Colleges*, 168 Vt. 459, 462, 724 A.2d 448, 450-51 (1998) (ambiguity in employee benefit plan drafted by party with superior bargaining power must be construed against drafter). As insurer is "standing in the shoes" of landlord for these purposes, this presumption applies just as strongly against insurer. *Joerg*, 2003 VT

27, ¶ 6 (quotations omitted). This is not, as the majority characterizes it, an argument that the terms of the contract should not bind tenants. See *ante*, ¶ 12 ("[W]e cannot conclude that it is the role of this Court to rewrite the parties' agreement solely because this landlord rents apartments to persons of low income and presumably limited ability to bargain on lease terms."). Rather, it is a presumption against the drafter of an ambiguous contract under circumstances where there is no question as to which party drafted the contract.

¶ 26. In sum, the lease contains: (1) a provision making tenants part owners of the development and, thus, part owners of the development's insurance policy; and (2) a provision containing at least an "implied agreement to maintain fire insurance on the leased premises," accompanied by an obligation on behalf of tenants to protect against an increase in the premiums of that insurance. *Rausch*, 882 A.2d at 816. To conclude that this lease does not implicate the holding of *Joerg*, we must first either repudiate or minimize the policy considerations contained in that case. We must then ignore what the lease plainly states about tenants' ownership interests, as well as what it encourages tenants to conclude about the development's insurance policy. We must do both of these things despite the relevance of public policy concerns to this question of equity, and despite our longstanding rule that contracts of adhesion are interpreted against their drafters. Although it may seem counterintuitive to relieve tenants from their admitted personal responsibility for the damage they caused, "'[w]e should enforce the contract that was made, not one we wish they made.'" *Joerg*, 2003 VT 27, ¶ 9 (quoting *Fairchild Square Co. v. Green Mountain Bagel Bakery, Inc.*, 163 Vt. 433, 444, 658 A.2d 31, 38 (1995) (Dooley, J., dissenting)). I would deny insurer's subrogation claim. I am authorized to state that Justice Skoglund joins in this dissent.