2009 VT 95

### Timothy J. PURO and Steven Yoken v. NEIL ENTERPRISES, INC. d/b/a Quechee Gorge Village

[987 A.2d 935]

No. 08-254

¶ 1. September 4, 2009. Two separate dealers of jewelry and coins appeal from summary judgment in favor of a company from which they leased display booths in the Antiques Mall at Quechee Gorge Village (the Mall). Following losses from theft, plaintiffs, Timothy Puro and Steven Yoken, alleged negligence on the part of the landlord and that they were fraudulently induced to lease the display booths by the Mall owner's misrepresentation of the Mall's security system and practices. Based on the same facts, plaintiffs also alleged negligent misrepresentation and a violation of the Consumer Fraud Act. See 9 V.S.A. §§ 2453, 2461(b). In reply, defendant argued that an exculpatory clause in its agreement with plaintiffs precluded any recovery. The superior court granted defendant summary judgment on that basis. Since we find that

defendant is not entitled to summary judgment on the fraud and negligent misrepresentation counts based on the exculpatory clause, we reverse and remand.

¶ 2. The Mall contains about 450 booths. Plaintiff Puro leased a display booth in 2005 to sell coins and currency. Plaintiff Yoken leased a display booth in 2002 to sell high-end custom jewelry. After hours on September 7, 2005, a thief or thieves broke into the Mall through the rear door and quickly stole jewelry and coins from plaintiffs' display booths. The alarm sounded and the security company notified the police. By the time police arrived, the thieves had fled. The Mall contains security cameras, some of which were attached to video recorders, but the images of the thieves were not recorded because the cameras were not operating at the time. The stolen merchandise was never recovered. Plaintiff Puro lost goods valued at $25,293; plaintiff Yoken lost goods valued at $31,698.

¶ 3. Central to this case are defendant's representations to plaintiffs about the presence of security at the Mall. Both plaintiffs received information about the Mall's security system from at least three sources on which they might have relied, in addition to any observations they may have made themselves. First, each spoke with the Mall's general manager, who was in charge of security. Second, each signed an agreement including the exculpatory clause. Third, each received a handbook with information on the Mall's security practices at the time each signed the agreement.

¶ 4. Before signing the agreement, each plaintiff discussed the Mall generally and its security system specifically with the Mall's general manager. The manager allegedly stated to plaintiff Yoken that the Mall had "video cameras everywhere" and that he lived "within minutes of [the Mall], and if anything ever happened [he] would be there first." In a similar conversation with plaintiff Puro, the manager allegedly stated that the Mall had an alarm system, infrared sensors, and cameras covering every booth at all times. He also described the alarm system as "state-of-the-art."[1]

¶ 5. Each plaintiff signed the "Quechee Gorge Village Dealer Contract." The agreements were identical and included exculpatory language stating in relevant part that defendant's:

> shareholders, directors, officers, agents, employees, and staff shall not be held liable for any damages to or loss of property from any cause whatsoever, including but not limited to fire or theft, it being understood that to the extent desired and at [the dealer's] option, that this property shall be insured by the undersigned dealer/licensee.

¶ 6. At the time of signing, each plaintiff received a copy of the "Quechee Gorge Village Dealer Handbook." In a section headed "Security," the handbook stated that:

> The Antique Mall is equipped with cameras and customer service personnel who watch over your merchandise. In addition, all dealers, while stocking their booths, are asked to report any suspicious activity to the manager. The building is secured by

---

[1] These alleged statements by the general manager are taken from depositions by plaintiffs and are somewhat more extensive than those in the trial court's decision. The deposition of the general manager suggests that these statements could be in keeping with information he typically provided, although he stated that he could not remember the specific statements he made to plaintiffs, given the number of conversations he had with potential dealers.

an alarm system with a direct link to the central office. All doors are alarmed as well as infrared motion detectors in strategic areas. The entire building is covered by a sprinkler system in case of fire. All keys for locks are accounted for on a daily basis. They are signed out and in each business day.

Another section of the handbook, headed "Lost or Damaged Merchandise," stated that "[d]ealers are responsible for their own lost or damaged merchandise. This does happen, and we encourage our dealers to get insurance for the items in their booths." Neither plaintiff obtained insurance for his merchandise.

¶ 7. The Mall did, in fact, have security cameras and an alarm system, although plaintiffs argue that important information about the Mall's security was either misrepresented or omitted. Three black and white cameras on the ground floor recorded onto a VCR, but during business hours only. The video footage was retained for seven days, but not routinely reviewed. As they were available, mall staff monitored a rotation of live images from these cameras at the checkout-counter. They additionally monitored unrecorded images from sixteen other cameras that were displayed at the checkout-counter on a screen divided to show views from four cameras at once. The Mall also used nonfunctioning dummy cameras as a theft deterrent. The Mall's exterior was not monitored by cameras.

¶ 8. Along with the cameras, the Mall had an alarm system administered by a security company with infrared motion sensors and sensors on all of the doors. When triggered, the alarm alerted the security company directly, which contacted defendant's security manager and then the police. A loud on-site siren would also sound. There was no signage to indicate the existence of this alarm.

¶ 9. Plaintiffs filed a joint complaint seeking relief on a number of counts. The complaint sought a declaratory judgment that the exculpatory clause in the lease was invalid. It sought a rescission of the lease contracts based on constructive fraud. Finally, it sought damages based on theories of fraud, negligent misrepresentation, consumer fraud, and negligence. Defendant moved for summary judgment on numerous grounds, including its contention that there were no material misrepresentations and that the action was barred by the exculpatory clause. The superior court granted summary judgment solely on the latter theory.

¶ 10. Summary judgment is appropriate only when the moving party has demonstrated that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. *Goldman v. Town of Plainfield*, 171 Vt. 575, 575, 762 A.2d 854, 855 (2000) (mem.); V.R.C.P. 56(c)(3). This Court "review[s] an award of summary judgment de novo, construing all doubts and inferences in favor of the nonmoving party." *Collins v. Thomas*, 2007 VT 92, ¶ 6, 182 Vt. 250, 938 A.2d 1208 (citation omitted).

¶ 11. Plaintiffs' first argument on appeal is that the exculpatory clause is invalid as against public policy and cannot bar any of the counts of their action. Plaintiffs present an argument based on the various factors we have used primarily in consumer transactions in evaluating the validity of exculpatory clauses. See *Behr v. Hook*, 173 Vt. 122, 126-27, 787 A.2d 499, 502-03 (2001); *Dalury v. S-K-I, Ltd.*, 164 Vt. 329, 332-33, 670 A.2d 795, 797-98 (1995). As the trial court found, however, the parties in this case are business persons with relatively equal bargaining power and were using the clause to determine which party would bear the cost of necessary insurance. We agree with the trial court that the relevant precedent is *Fairchild Square Co. v.*

*Green Mountain Bagel Bakery, Inc.*, 163 Vt. 433, 437, 658 A.2d 31, 33 (1995), where we upheld an exculpatory clause covering fire or casualty loss between a landlord and a commercial tenant. We note additionally that exculpatory clauses relating to security services are routine in business agreements and are virtually unanimously upheld by the courts. See generally M. Shields, Annotation, *Validity, Construction, and Application of Exculpatory and Limitation of Liability Clauses in Burglary, Fire, and Other Home and Business Monitoring Service Contracts*, 36 A.L.R.6th 305, 338-52, § 9 (2008). We reject plaintiffs' argument that the exculpatory clause is invalid.

¶ 12. Plaintiffs have not contested the superior court decision with respect to their negligence count if the exculpatory clause is valid, and, therefore, we affirm the summary judgment as to the negligence count. We agree with plaintiffs, however, that the exculpatory clause does not bar the fraud, negligent misrepresentation, or consumer fraud counts.

¶ 13. We have not addressed whether an exculpatory clause defeats a claim of fraud in the inducement. We have, however, considered whether a contract for sale of a house, which included a clause that no representation had been made as to the "condition" of the house, would defeat a claim of negligent misrepresentation with respect to the condition of the house. See *Silva v. Stevens*, 156 Vt. 94, 589 A.2d 852 (1991). Relying upon decisions from numerous jurisdictions, we held that the "as-is" clause did not defeat the negligent misrepresentation claim. *Id.* at 112-13, 589 A.2d at 862-63.

¶ 14. Whether we view the issue as one of fair construction of the exculpatory clause or implementation of a policy that denies a party the benefit of a fraudulent act, we conclude that the result here should be the same as in *Silva*: that is, the exculpatory clause does not defeat the fraud or negligent misrepresentation claim. The decisions from other jurisdictions uniformly support this result, at least as to fraud claims. See *Airfreight Express LTD. v. Evergreen Air Ctr., Inc.*, 158 P.3d 232, 239-40 (Ariz. Ct. App. 2007) (collecting cases); *Mankap Enters., Inc. v. Wells Fargo Alarm Servs.*, 427 So. 2d 332, 333-34 (Fla. Dist. Ct. App. 1983) (exculpatory clause in burglary alarm contract ineffective against claim of fraud because "a party cannot contract against liability for his own fraud"); *Osterhaus v. Toth*, 187 P.3d 126, 135 (Kan. Ct. App. 2008) (law will not sustain covenant of immunity that protects against consequences of fraud); *Bates v. Southgate*, 31 N.E.2d 551, 558 (Mass. 1941) (contracts protecting party against consequences of party's fraud are unenforceable); *Morgan Co. v. Minn. Mining & Mfg. Co.*, 246 N.W.2d 443, 448 (Minn. 1976) (exculpatory clause in burglar alarm contract does not apply to fraud and misrepresentation claims); *Cirillo v. Slomin's Inc.*, 768 N.Y.S.2d 759, 769 (Sup. Ct. 2003) (exculpatory clauses in burglary alarm contract do not exculpate the defendant from its own fraud); *Houghland v. Sec. Alarms & Servs., Inc.*, 755 S.W.2d 769, 773 (Tenn. 1988) (exculpatory "clauses do not ordinarily protect against liability for fraud or intentional misrepresentation"). But see *Sound Techniques, Inc. v. Hoffman*, 737 N.E.2d 920, 926 (Mass. App. Ct. 2000) (exculpatory clause defeats negligent misrepresentation claim).

¶ 15. We reach the same result under the Consumer Fraud Act, 9 V.S.A. §§ 2453, 2461(b), which the Legislature enacted "to protect this state's citizens from unfair and deceptive business practices and to encourage a commercial environment highlighted by integrity and fairness." *Gramatan Home Investors Corp. v. Starling*, 143 Vt. 527, 536, 470 A.2d 1157, 1162 (1983).[2] For the same

---

[2] We need not resolve in this case whether the Act itself precludes the enforcement

reasons that the exculpatory clause does not prohibit a fraud remedy, we hold that it does not prohibit a consumer fraud remedy. See *Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC*, 832 A.2d 116, 126-27 (Del. Ch. 2003); *Wall v. Planet Ford, Inc.*, 2005-Ohio-1207, 825 N.E.2d 686, ¶¶ 25-26; *First Title Co. of Waco v. Garrett*, 860 S.W.2d 74, 77 (Tex. 1993).

¶ 16. In the event that we reverse and remand on the effect of the exculpatory clause, defendant urges that we reach its other grounds for summary judgment. As they were not reached by the superior court, we decline to do so here.

*Reversed and remanded for proceedings consistent with this decision.*

_____

of an exculpatory clause. See 9 V.S.A. § 2461(b) (language which attempts to exclude recovery "of the penalty or reasonable attorney's fees" is unenforceable).